# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

AUTOMATED TRACKING
SOLUTIONS, LLC,

              Plaintiff,

              v.

THE COCA-COLA COMPANY,

              Defendant.

)
)
)
)
)
)
)
)
)
)

Case No. 1:15-cv-4348-WD

## THE COCA-COLA COMPANY'S
## MEMORANDUM OF LAW IN SUPPORT OF ITS
## <u>MOTION FOR JUDGMENT ON THE PLEADINGS</u>

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................1

STATEMENT OF FACTS ..........................................................................3

  I.  THE CLAIMED INVENTION ..............................................................3

  II.  THE ASSERTED CLAIMS ..................................................................5

    A.  The '089 and '013 Patents .............................................................5

    B.  The '766 and '449 Patents .............................................................8

ARGUMENT ...........................................................................................11

  I.  JUDGMENT ON THE PLEADINGS IS APPROPRIATE ..........................11

  II.  THE ASSERTED PATENTS RECITE PATENT-INELIGIBLE
     SUBJECT MATTER ........................................................................12

    A.  Merely Adding Generic Hardware to Abstract Concepts Does Not
      Create Patentable Subject Matter under Section 101. ................12

    B.  The Asserted Patents Claim Abstract Concepts .........................14

    C.  The Asserted Patents Do Not Transform the Abstract Idea into Patent
      Eligible Subject Matter ...............................................................19

CONCLUSION ........................................................................................25

# TABLE OF AUTHORITIES

**CASES**

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
134 S. Ct. 2347 (2014).................................................................passim

*Amdocs (Isr.) Ltd. v. Openet Telecom, Inc.*,
56 F. Supp. 3d 813 (E.D. Va. Oct. 24, 2014) ......................................12

*Ariosa Diagnostics, Inc. v. Sequenom, Inc.*,
788 F.3d 1371 (Fed. Cir. 2015) ..........................................................23

*Bilski v. Kappos*,
130 S. Ct. 3218 (2010).................................................................14, 23

*Blue Spike, LLC v. Google, Inc.*,
No. 14-CV-01650-YGR, 2015 WL 5260506
(N.D. Cal. Sep. 8, 2015) ......................................................................23

*buySAFE, Inc. v. Google, Inc.*,
765 F.3d 1350 (Fed. Cir. 2014) ..........................................................11

*Concaten, Inc. v. Ameritrak Fleet Solutions, LLC*,
No. 14-cv-00790-PAB-NYW, 2015 WL 5579562
(D. Colo. Sep. 23, 2015) ......................................................................25

*Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*,
776 F.3d 1343 (Fed. Cir. 2014) ......................................5, 16, 17, 19

*DDR Holdings, LLC v. Hotels.com, LP*,
773 F.3d 1245 (Fed. Cir. 2014) ..........................................................24

*Diamond v. Diehr*,
450 U.S. 175 (1981).............................................................................23

*Enfish LLC v. Microsoft Corp.*,
56 F. Supp. 3d 1167 (C.D. Cal. 2014) .................................................14

*Epic Tech., LLC v. Fitnow, Inc.*,
No. 2:15-CV-00442-DB, 2015 WL 8160884
(D. Utah Dec. 7, 2015) ........................................................................20

*In re West View Research, LLC*,
No. 14-CV-2675-CAB (WVG), 2015 WL 9685577
(S.D. Cal. Dec. 11, 2015) ....................................................................22

*Intellectual Ventures I LLC v. Capital One Bank (USA)*,
792 F.3d 1363 (Fed. Cir. 2015) ....................................................16, 24

*Intellectual Ventures I LLC v. Symantec Corp.*,
100 F. Supp. 3d 371 (D. Del. 2015) ....................................................18

*Joao Control & Monitoring Systems, LLC v. Telular Corp.*,
No. 14 C 9852, 2016 WL 1161287 (N.D. Ill. Mar. 23, 2016)..........18, 19, 21, 22

*Loyalty Conversion Sys. Corp. v. Am. Airlines, Inc.*,
66 F. Supp. 3d 829 (E.D. Tex. Sept. 3, 2014) ....................................12

*MacroPoint, LLC v. FourKites, Inc.*
2015 WL 6870118 (N.D. Ohio Nov. 6, 2015)..............................17, 18

*Mayo Collaborative Servs. v. Prometheus Labs.*,
132 S. Ct. 1289 (2012) ..................................................................14, 19

*Mobile Telecomm. Techs., LLC v. United Parcel Serv., Inc.*, No. 1:12-
CV-3222-AT, 2016 WL 1171191 (N.D. Ga. Mar. 24, 2016).....................passim

*OIP Techs., Inc. v. Amazon.com, Inc.*,
788 F.3d 1359 (Fed. Cir. 2015) ..........................................................24

*Vehicle Intelligence and Safety LLC v. Mercedes-Benz USA, LLC*,
No. 2015-1411, 2015 WL 9461707, --- Fed. App'x. ----
(Fed. Cir. Dec. 28, 2015) ....................................................................20

*Versata Dev. Grp., Inc. v. SAP Am., Inc.*,
793 F.3d 1306 (Fed. Cir. 2015) ..........................................................16

*Wireless Media Innovations, LLC v. Maher Terminals, LLC*,
100 F. Supp. 3d 405 (D.N.J. 2015)..............................................17, 18, 23

**RULES**

Fed. R. Civ. P. 12(c)...............................................................................................11

**STATUTES**

35 U.S.C. § 101 .............................................................................................passim

## INTRODUCTION

This is a patent infringement action, recently transferred to this District from the U.S. District Court for the Eastern District of Virginia.  Plaintiff Automated Tracking Solutions, LLC ("ATS") has accused The Coca-Cola Company ("Coca-Cola") of infringing four of its patents directed to the basic concept of "locating, identifying, and tracking" objects and people.  Coca-Cola moves for judgment on the pleadings that the asserted patents, U.S. Patent Nos. 7,551,089 ("the '089 Patent"), 7,834,766 ("the '766 Patent"), 8,842,013 ("the '013 Patent"), and 8,896,449 ("the '449 Patent) (collectively, "patents-in-suit") are invalid under 35 U.S.C. § 101, because they are directed to nothing more than an abstract idea (*i.e.*, locating, identifying and tracking objects) implemented by well known, pre-existing, computerized technologies (*e.g.*, radio-frequency identification ("RFID")).

A U.S. patent may be issued to a person who "invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101.  The Supreme Court recently expounded the Patent Act's statutory exception that prohibits issuing patents directed to "[l]aws of nature, natural phenomena, and abstract ideas" in *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2358 (2014).  "The exception exists

because '[l]aws of nature, natural phenomena, and abstract ideas are the basic tools of scientific and technological work,' and '[m]onopolization of those tools through the grant of a patent might tend to impede innovation more than it would tend to promote it.'" *Mobile Telecomm. Techs., LLC v. United Parcel Serv., Inc*., No. 1:12-CV-3222-AT, 2016 WL 1171191, at *8 (N.D. Ga. Mar. 24, 2016) (Totenberg, J.) (citations omitted) (hereinafter "*Mtel*").  Because the Supreme Court's interpretation of Section 101 is narrower than the interpretation applied by the U.S. Patent and Trademark Office ("PTO"), many lower courts have recently confronted and invalidated U.S. patents previously issued under the PTO's now-outdated application of Section 101.

 *Alice* makes clear that the Patent Act prohibits issuance of a patent directed merely to the automation of a manual and abstract process (*e.g*., locating, identifying, and tracking objects) through the use of well-known, existing computerized technology (RFID). Coca-Cola's patentability challenge is therefore ripe for this Court's review.  As this Court recently recognized, a Section 101 defense "raises [a] threshold question of patent validity" which is "fundamental to [a plaintiff's] ability to recover." *Mtel*, 2016 WL 1171191, at *8.  The asserted patents by their own terms and under their own arguments, cover a system and method for tracking objects that could be implemented with generic components,

using existing and conventional RFID technology.  These are precisely the kind of invalid patents at which *Alice* was aimed.

## STATEMENT OF FACTS

**I.      THE CLAIMED INVENTION**

All of the patents-in-suit are entitled "Method and Apparatus for Tracking Objects and People" and share a virtually identical specification. The patents purport to be directed "generally to object or asset locating, tracking and surveillance, and, more particularly to a method and apparatus for locating, identifying, tracking and surveillance of physical objects and evidence in environments such as police departments, law offices, and the Courts" (*e.g.*, Ex. B ('089 Patent) at Col. 1:16-22). According to the patents, existing methods for tracking objects or evidence – through use of handwritten entry logs or bar-code systems, for example – were "inadequate," and there was a "need to reduce human responsibility in locating, tracking, and surveillance" of such objects or evidence (*id*. at Col. 1:24-49). The patents-in-suit purport to "reduce human responsibility" for inventory management through implementation of existing RFID technology and other generic computer and hardware components (*id*. at Col. 2:45-50) (describing that invention achieves its purpose by "employing radio frequency identification (RFID) technology, computer

programming and database applications, networking technologies, and hardware elements for locating, identifying, tracking, and surveillance of objects").

The inventor of the patents-in-suit, Fred Sawyer, does not claim to have invented RFID, nor do the patents claim or describe any improvements to existing RFID generic hardware to perform the claimed invention.  Rather, as the patents themselves make clear, RFID is a well-known technology typically comprising the following standard components: (1) a transponder ("tag") associated with an object that contains electronically stored identifying information; (2) a scanner (reader) coupled with antennas to communicate with the transponder and receive the electronically stored information via radio frequency ("RF") signals; and (3) a general purpose computer to store and process the transponder information (*see id*. at Col. 3:4-32 (generally describing RFID as a "means for storing and retrieving data through electromagnetic transmission to a radio frequency compatible integrated circuit," noting that existing RFID systems include a "scanner" (reader), a transponder, a computer, and an antenna); *see also* D.I. 59 at 5-6 (describing standard RFID functionality)).  According to ATS, the purported novelty of the patents-in-suit is nothing more than their "use of radio frequency identification (RFID) technology to provide accurate tracking technology for objects having RFID tags" to "effectively and efficiently manage inventory and other tagged objects" (D.I. 59

at 1; *see also id*. at 5 ("The claimed invention achieves effective inventory management through the use of RFID technology")).

## II.    THE ASSERTED CLAIMS

ATS has asserted 25 patent claims against Coca-Cola (Ex. A).  Every asserted claim recites generic RFID components and/or generic computer hardware to "locat[e], identify[], and/or track[]" objects.  The differences between the asserted claims are trivial, as set forth below.[1]

### A.    The '089 and '013 Patents

The asserted claims of the '089 and '013 Patents are directed to a system that first detects "transponder ID" information associated with an object – any "identifying information" relating to the transponder (Ex. B ('089 Patent) at Col. Col. 3:15-16) – through standard RFID equipment (*i.e.*, a transponder, reader, and

---

[1]Identified below are representative claims for each of the patents-in-suit that are "substantially similar and linked to the same abstract idea" of all asserted claims. *See Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A*., 776 F.3d 1343, 1348 (Fed. Cir. 2014). When deciding this motion, the Court need not address all 25 asserted claims separately.  If the Court holds that the representative claims are invalid, the remaining asserted claims should also be held invalid for the same reason – they are also directed to the same abstract concept and the specific limitations of the remaining claims do not transform them into "something more" to impart patentability. *Id*.

antenna). The system is described as using generic computer components (*i.e.*, a "storage device" and "processor") to store and then compare the identifying information to determine whether the detected object is (1) recognized (known) to the system, (2) has or has not been previously detected, or (3) is completely new to the system.

Specifically, representative independent claim 49 of the '089 Patent recites the following components:

> A system for locating, identifying, and/or tracking of at least one object, said system comprising:
>
> A **transponder** affixable to the object, the transponder associated with a transponder identification (ID);
>
> A **reader** for detecting a transponder ID;
>
> An **antenna** for communicating radio frequency (RF) signals between said reader and said transponder, the RF signals including the transponder ID;
>
> A **storage device** for storing known transponder IDs and detection information associated with the stored known transponder IDs, wherein the detection information indicates whether the stored known transponder ID has been previously detected by the system; and
>
> A **processor** for comparing the known transponder IDs stored in said storage device with the detected transponder ID, and determining whether the detected transponder ID is a detected known transponder ID based on the comparison of the known transponder IDs with the detected transponder ID.

(*Id.* at Col. 30:15-33.)  As noted above, the transponder, reader, and antenna components of the asserted claims were well known structural components used in

6

existing RFID systems long before the date of invention claimed here.  Indeed, ATS's proposed constructions for "transponder" and "reader" define those structural components in terms of their ordinary and conventional function in existing RFID systems at the time the patents were filed – a "transponder" is nothing more than a "tag, a device that stores data and transmits data via radio frequency signals," and a "reader" is any "device used to communicate with transponders via radio frequency signals" (Ex. F).

The "storage device" is purportedly used for "storing" transponder ID information received through the RFID components in the form of "known transponder IDs[2] and detection information" (claims 49 and 62) or "previously detected transponder IDs" and "information associated with the stored transponder ID" (claim 57).  Further, the claimed "processor"  is used for "comparing" the stored transponder ID information with the transponder ID detected by the reader of the claimed system (referred to as a "detected transponder ID") to determine if that "detected transponder ID" is a "detected known transponder ID" (claims 49, 55, 60 and 62), has been "previously detected," (claims 49, 50, 57, and 62), "previously undetected" (claim 57), or is "new to the system" (claim 62).  Claim

---

[2] The parties' agreed-to construction for "known transponder ID" is simply a "[transponder ID] recognized by the system" (Ex. F).

7

49 does not describe how or what comparisons are used to make these determinations.  Dependent claims 55 and 60, however, include additional recitations that the processor can perform the comparison by simply "match[ing]" transponder IDs stored in the storage device with the detected transponder ID.

The asserted claims of the '013 Patent are substantially similar to the asserted claims of the '089 Patent described above, except that they are directed to a system for locating, identifying, and/or tracking a "transponder" instead of an "object" (*see* Representative Claim 1, Ex. C ('013 Patent) at Col. 20:59-21:6).  The asserted claims of the '013 Patent omits the "reader," and "antenna" recitations found in the asserted claims of the '089 Patent, and are directed only to generic computer components in the form of a "storage device" and "processor" for performing the same "storing," "comparing," and "determining" functions for the various transponder IDs recited in the '089 patent claims.  Apart from these differences, the asserted claims of the '013 are substantially identical to the asserted claims of the '089 Patent.

### B.    The '766 and '449 Patents

The asserted claims of the '766 and '449 Patents recite the same structural components claimed in the '089 and '013 Patents ("transponder," "reader," "antenna," "processor," and "storage device"), but purport to process the

transponder information in a different, yet still conventional, way.  In those claims,

the RFID and computer components are purportedly used to locate and track

objects by receiving information from the transponder associated with an object,

generating "detection information" based on that data, and using a portion of that

information – dubbed "last sighting" information – to determine whether the object

is "dwelling" in a particular "coverage area."

> For example, representative claim 1 of the '766 Patent recites:

> A system for locating, identifying, and/or tracking of an object, said system comprising:

> a first transponder associated with the object;

> a reader that is configured to receive first transponder data via a radio frequency (RF) signal from the first transponder;

> an antenna in communication with the reader and having a first coverage area;

> a processor coupled to the reader, wherein the processor is configured to *receive the first transponder data from the reader [and]*, *to generate detection information based on the received first transponder data*, the detection information comprising first sighting and last sighting of the first transponder in the first coverage area, and to *use the last sighting of the first transponder to determine whether the first transponder is dwelling in the first coverage area*; and

> a storage device that is configured to store the detection information.

(Ex. D ('766 Patent Ex Parte Reexamination) at 1:22-2:11).  The '766 Patent thus

claims a system including a generic processor configured to (1) receive

transponder data from the reader, (2) generate from that data "detection

information" concerning the "first sighting" and "last sighting" of a tagged object in a "first coverage area," and (3) use the "last sighting" to determine whether the object is "dwelling" in the first coverage area. The claim also recites a storage device to store the "detection information" generated by the processor. ATS has proposed that "first sighting" means simply the "first detection," that "last sighting" means the "most recent detection," and that "dwelling" means "not moving for a period of time" (Ex. F). Under ATS's own claim interpretations, therefore, the '766 Patent recites nothing more than a computer-implemented RFID system to determine whether a particular object has "not been moving for a period of time" based on information concerning when it was "most recent[ly] detect[ed]" by the system.

The remaining asserted claims of the '766 Patent include additional limitations that do not meaningfully differ from the scope of claim 1: "a plurality of transponders, readers, and antennas" (claim 2); that the first transponder be "configured to be affixed to the object" (claim 46); and that the first transponder be a "passive tag"[3] (claim 62). Notably, claim 64 is a method claim that purports to cover the same basic system of claim 1.

_____

[3] The parties have agreed that "passive [transponder]" means "transponder not containing a power source" (Ex. F). The patents describe passive and active

The '449 Patent is directed to the same basic concept as the '766 Patent, but specifically claims an "RFID system" comprising only a "processor" to perform the same functions described above (*see* Representative Claim 1, Ex. E ('449 Patent) at 20:59-63).  The remaining asserted dependent claims add trivial limitations to this basic system: a storage device configured to store detection information (claim 5); inclusion of a "timestamp" in the "first sighting" and "last sighting" information (claims 13-14); and requiring the transponder to be a "passive tag" (claim 19). The '449 Patent also includes two method claims, which purport to cover the same basic system claimed in the '766 Patent for locating objects in a coverage area (claims 23-24).

## ARGUMENT

### I.    JUDGMENT ON THE PLEADINGS IS APPROPRIATE

Courts routinely decide patent eligibility in motions for judgment on the pleadings because patent eligibility is a question of law that can be resolved at the outset of a case without considering any matters outside of the four corners of the patent itself. *See, e.g., buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350 (Fed. Cir.

---

transponders and their well-known use in existing RFID systems (*e.g.*, Ex. B ('089 Patent) at Col. 3:13-15 ("The transponder may be an active or passive design depending on whether it contains a power source").

2014); *Amdocs (Isr.) Ltd. v. Openet Telecom, Inc.*, 56 F. Supp. 3d 813 (E.D. Va. Oct. 24, 2014); *Loyalty Conversion Sys. Corp. v. Am. Airlines, Inc.,* 66 F. Supp. 3d 829 (E.D. Tex. Sept. 3, 2014).

A motion for judgment on the pleadings can be made at any point in litigation after the pleadings are closed as long as the motion does not delay trial. *See* Fed. R. Civ. P. 12(c).  Indeed, this Court recently granted a motion for judgment on the pleadings pursuant to Section 101, recognizing that the Court may reach the purely legal and "threshold" issue of a Section 101 defense "before discovery even beg[ins]."  *Mtel,* 2016 WL 1171191, at *8.

## II.    THE ASSERTED PATENTS RECITE PATENT-INELIGIBLE SUBJECT MATTER

### A.    Merely Adding Generic Hardware to Abstract Concepts Does Not Create Patentable Subject Matter under Section 101.

In *Alice*, the Supreme Court held that a patent issued on a computer-based escrow system for financial transactions was not patentable because 35 U.S.C. § 101 was limited to "new and useful process, machine, manufacture, or composition of matter," and did not extend to "abstract ideas," as these are the basic "building blocks of human ingenuity" from which all innovations are derived.  *Alice,* 134 S. Ct. at 2354.  The "concern that drives this exclusionary principle [is] one of pre-emption."  *Id.*  Indeed, "monopolization of those tools

through the grant of a patent might tend to impede innovation more than it would tend to promote it, thereby thwarting the primary objective of the patent laws." *Id.*

*Alice* teaches a two-part test to determine whether a claim is eligible for patent protection under Section 101.  First, the Court must determine whether a claim is directed to a patent-ineligible concept (*i.e.*, laws of nature, natural phenomena, or abstract ideas).  *Id.* at 2355.  If so, the Court must then determine whether "additional elements **transform** the nature of the claim" into something "**significantly more** than a patent upon the ineligible concept itself."  *Id.* (internal quotations omitted) (emphasis added).  This second step has been characterized as a search for an "inventive concept," which ensures that the claims amount to more than a patent on the abstract idea itself.  *Id.*

The *Alice* Court rejected claims relating to a computerized system and method for mitigating settlement risks that included a "data processing system," a "communications controller," and a "data storage unit," holding that "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention."  *Alice*, 134 S. Ct. at 2358-60.  The Court further explained that, because of the well-known use of computers, a "generic computer implementation is not generally the sort of additional feature that provides any practical assurance that the process is more than a drafting effort designed to

monopolize the [abstract idea] itself." *Id.* at 2358 (citing *Mayo Collaborative Servs. v. Prometheus Labs.*, 132 S. Ct. 1289, 1297 (2012)).  Moreover, limitations directed to a "particular technological environment" cannot be used to circumvent Section 101. *See Bilski v. Kappos*, 130 S. Ct. 3218, 3230 (2010)).

In the wake of the Supreme Court's decision, lower courts have invalidated numerous patents that fail the two-prong *Alice* test.  *Mtel*, 2016 WL 1171191 at *4 (noting that "the Federal Circuit and district courts have quickly fallen in line with *Alice Corp.* and its sister cases, and have regularly invalidated" patents under Section 101).

### B.    The Asserted Patents Claim Abstract Concepts

By ATS's own admission, the asserted patents are directed to the use of existing computer technology with standard RFID capabilities to perform the concepts of locating, identifying, and/or tracking objects for purposes of managing inventory more efficiently (*see* D.I. 59 at 1, 5).  But locating, identifying, and/or tracking objects to manage inventory is an abstract idea.

In assessing step one of *Alice*, "courts should recite a claim's purpose at a reasonably high level of generality.  Step one is sort of a 'quick look' test, the purpose of which is to identify a risk of preemption and ineligibility." *Enfish LLC v. Microsoft Corp.*, 56 F. Supp. 3d 1167, 1173 (C.D. Cal. 2014).  As this Court

recently recognized, when confronted with a question of whether an invention is abstract, "the trick is to try and detect the beating heart of the patent, its animating function." *Mtel*, 2016 WL 1171191, at *3. "If that heart is a law of nature or natural phenomenon, 'fundamental economic practice,' 'conventional business practice,' or a 'method of organizing human activity' that has long been prevalent in our system of commerce,' then the patent is aimed at an abstract idea." *Id.* (quoting *Alice*, 134 S. Ct. at 2356).

The "beating heart" of the Asserted Patents – to locate, identify, and track physical objects for purposes of inventory control – is without question a "method of organizing human activity" that has long been prevalent in our system of commerce.  Indeed, the Asserted Patents themselves confirm that the abstract concept of locating, identifying, and/or tracking physical objects was well known and could be performed using handwritten entries or bar code systems (*e.g.*, Ex. B ('089 Patent) at Col. 1:24-49).  According to ATS's Complaint, "inventory control was conventionally performed primarily by hand or not at all," and the inventor sought to "integrate" RFID "into these manual processes"  (D.I. 33 at ¶ 11-12).  As such, there was a purported "need to reduce human responsibility in locating, tracking, and surveillance of physical objects" (Ex. B ('089 Patent) at Col. 1:46-49).  The way the patents "reduce human responsibility" is by implementing

known RFID and generic computer hardware components to replace the otherwise longstanding manual methods for locating, identifying, and/or tracking objects.

The Federal Circuit has repeatedly affirmed district court holdings that patents directed to methods that could be performed by humans are invalid.  *See, e.g., Versata Dev. Grp., Inc. v. SAP Am., Inc.*, 793 F.3d 1306, 1335 (Fed. Cir. 2015) ("Courts have examined claims that required the use of a computer and still found that the underlying, patent-ineligible invention could be performed via pen and paper or in a person's mind."); *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1368 (Fed. Cir. 2015) ("*Capital One*") (holding claims directed to budgeting notifications were unpatentable because they "could still be made using a pencil and paper with a simple notification device") (internal quotations omitted).  Indeed, the Federal Circuit has determined that claims are directed to an abstract idea when they recite a concept that was "undisputably well known" and that "humans have always performed."  *Content Extraction*, 776 F.3d at 1347.

Here, the patent claims are aimed at the abstract concept of locating, identifying and tracking objects by receipt of object data through standard RFID equipment, and then storing, processing, and comparing that data with generic "storage devices" and "processors" to locate, identify and track objects within the

claimed system.  There can be no dispute that the concept of locating, identifying and tracking objects for purposes of managing inventory is one that "humans have always performed."  *See id*.  For hundreds of years, humans have performed basic inventory management in commercial and other contexts, by storing and comparing various information – including product identifying information – to track inventory.  Thus the "heart" of the patented claims is necessarily directed to an abstract idea.

District courts have recently invalidated patents directed to abstract concepts strikingly similar to those at issue here.  For example, in *MacroPoint, LLC v. FourKites, Inc*., the court held that patents were directed towards an abstract idea because their claims "disclose nothing more than a process for tracking freight, including monitoring, locating, and communicating regarding the location of freight," which "are all abstract in and of themselves." 2015 WL 6870118, at *3 (N.D. Ohio Nov. 6, 2015).   Similarly, in *Wireless Media Innovations, LLC v. Maher Terminals, LLC*, the court found that a "system for monitoring shipping containers and a computerized system for monitoring and recording location and load status of shipping containers relative to a facility" was aimed at an abstract idea, because the claims reflected "nothing more that the abstract process of monitoring and moving shipping containers and collecting the relevant data as to

the location of the shipping containers." 100 F. Supp. 3d 405, 415, 417 (D.N.J. 2015). The court in *Intellectual Ventures I LLC v. Symantec Corp*., 100 F. Supp. 3d 371 (D. Del. 2015) also held that claims reciting the steps of receiving identity information, comparing it to other stored information, and communicating results based on the identifying information were directed to a "generic computer implementation of abstract ideas." *Id*. at 383.

The claims at issue here functionally are no different than those found invalid in *MacroPoint*, *Wireless Media, and Symantec*. The claims recite systems for tracking objects by "detecting" identifying information associated with an object, and "storing" and "comparing" that information to make basic determinations about (1) whether the object is one previously recognized by the system (the '089 and '013 Patents) or (2) whether the object is "dwelling" ("not moving for a period of time") in a particular area (the '766 and '449 Patents). At their core, these claims simply recite conventional business practices that have been performed by humans for centuries.

Moreover, the claims' recitation of "physical, tangible components" do not render those claims non-abstract. "An abstract idea . . . is not patentable merely because it includes physical components or structures." *Joao Control & Monitoring Systems, LLC v. Telular Corp*., No. 14 C 9852, 2016 WL 1161287, at

*8 (N.D. Ill. Mar. 23, 2016) (citing *Alice*, 134 S. Ct. at 2358).  Indeed, in *Alice*, the fact that the abstract idea of intermediated settlement was performed using a computer, which "necessarily exist[s] in the physical, rather than purely conceptual, realm…[was] beside the point."  *Alice*, 134 S. Ct. at 2358.  In this case, the patent claims recite nothing more than the concept of locating, identifying, and tracking objects through use of existing, well known standard RFID and computer equipment.  "This is not sufficient to transform this abstract idea into a patentable invention."  *Joao Control*, 2016 WL 1161287, at *8; *see also Content Extraction* (finding claims drawn to abstract concept of data recognition and storage even though the claims required not only a computer but also an additional machine – a "scanner").  The fact that ATS may have "automated the process of [inventory management] in a particular way does not, under the circumstances of this case, render the ultimate idea behind its patent different or unique in substance from the general idea itself."  *Mtel*, 2016 WL 1171191, at *5.

### C.    The Asserted Patents Do Not Transform the Abstract Idea into Patent Eligible Subject Matter

To be eligible for patent protection, claims directed to an abstract idea must recite additional elements such that they "***transform*** the nature of the claim" into something "***significantly more*** than a patent upon the ineligible concept itself." *Alice*, 134 S. Ct. at 2355 (citing *Mayo*, 132 S. Ct. at 1294) (emphasis added).  The

claims at issue here fall far short of this standard: they recite nothing more than the abstract idea itself, implemented using generic RFID and computer components, which fail to transform the claims into patentable subject matter.  As this Court recently found, whether claims add inventive concept is "determined by the quality, not the quantity, of [the claims'] specific adornments and limitations." *Mtel,* 2016 WL 1161287, at *7.

The claims' recitation of well-known RFID and computer equipment is not sufficient to impart patentable subject matter.  As noted above, the claimed RFID components are standard components used in existing RFID systems at the time of the invention, and ATS's proposed constructions for "transponder" and "reader" broadly define those structural components in terms of their conventional function in those systems – to detect and receive transponder information through communication of radio frequency signals (*see* Section II.A ("The '089 and '013 Patents"), *supra*).  But "[m]erely stating that the methods at issue are performed on already existing . . . equipment, without more, does not save the disputed claims from abstraction." *Vehicle Intelligence and Safety LLC v. Mercedes-Benz USA, LLC*, No. 2015-1411, 2015 WL 9461707, at *4, --- Fed. App'x. ---- (Fed. Cir. Dec. 28, 2015); *see also Epic Tech., LLC v. Fitnow, Inc*., No. 2:15-CV-00442-DB, 2015 WL 8160884, at *4 (D. Utah Dec. 7, 2015) (recognizing that the Supreme Court

20

"has cautioned against allowing generic recitation of a computer or other conventional technology to transform an ineligible concept into patent eligible subject matter").

Nothing in the claims – or the patent specification – disclose specialized RFID hardware different than that already in use at the time the patents were filed, nor do the claims improve or change the conventional function of those components. Indeed, "[a]bsent from the claims is any inventive concept, such as the use of unconventional software or . . . equipment with special capabilities that can 'improve the functioning of the [equipment] itself.'" *Joao Control*, 2016 WL 1161287, at *10 (quoting *Alice*, 134 S. Ct. at 2359). Therefore, the addition of these standard RFID components do not transform the abstract claims into something "significantly more" than a patent on the "ineligible concept itself." *Alice*, 134 S. Ct. at 2355

The claimed general purpose "processors" and "storage devices" similarly fail to save the claims "from the universe of the unpatentable," because such devices are "purely functional and generic." *Mtel*, 2016 WL 1171191, at *6 (citing *Alice Corp.*, 134 S. Ct. at 2359). As described above, the limitations of the '089 and '013 Patents utilize generic computer technology to (1) store transponder ID information; (2) compare the transponder ID being detected by the system with the

21

stored information; and (3) based on the comparison, determine whether an object is "known" to the system, has been "previously detected," or is "new" to the system (*see* Section II.A ("The '089 and '013 Patents"), *supra*).  The limitations of the '766 and '449 Patents similarly use general purpose computers to (1) generate "detection information" based on data received in the system, (2) store the "detection information" and (3) "use" a portion of the "detection information" to make a determination concerning whether a transponder "dwells" within a coverage area (*see* Section II.B ("The '766 and '449 Patents"), *supra*).

"Storing," "comparing," and "generating" data, and making basic determinations concerning the existence or location of objects within the claimed system based on that data, are nothing more than "basic computing functions" that can be performed by any general purpose computer.  *E.g.*, *Joao Control*, 2016 WL 1161287, at *6 (describing "processing," "receiving," and "storing" as "basic computing functions" because "[a]t its most basic . . . a computer is an automatic electronic device for performing mathematical or logical operations") (citations omitted); *In re West View Research, LLC*, 2015 WL 9685577, at * 7 (S.D. Cal. Dec. 11, 2015) ("A computer generating data in response to inputted data – is what computers have done since their inception, as courts have recognized for years").  The patents do not claim or identify any specialized computer hardware to perform

22

the generic functions described above.  As a result, these basic functions simply represent "insignificant data-gathering steps that add nothing of practical significance to the abstract idea underneath."  *Wireless Media*, 100 F. Supp. 3d at 416; *Blue Spike, LLC v. Google, Inc.,* No. 14-CV-01650-YGR, 2015 WL 5260506, at *6 (N.D. Cal. Sep. 8, 2015) ("Merely adding limitations involving the use of general purpose computer components to an otherwise abstract concept does not constitute an inventive concept sufficient to save a claim from invalidity.").

The fact that the claims purport to be directed to RFID systems does not change the analysis, because limitations on field of use cannot transform abstract ideas into patentable inventions. *See Bilski*, 130 S. Ct. at 3230 ("[T]he prohibition against patenting abstract ideas 'cannot be circumvented by attempting to limit the use of the [abstract idea] to a particular technological environment.'") (quoting *Diamond v. Diehr*, 450 U.S. 175, 191 (1981)).  Although "preemption may signal patent eligible subject matter, the absence of complete preemption does not demonstrate patent eligibility." *Ariosa Diagnostics, Inc. v. Sequenom, Inc*., 788 F.3d 1371, 1379 (Fed. Cir. 2015).  Here, ATS seeks to preempt all use of RFID to perform the abstract concepts of locating, identifying, and tracking objects. Although the scope of the claims may not preempt other technologies and other uses to achieve that same abstract end, this does not mean that the claims "escape

the gravity of the preemption concerns that figure prominently in *Alice Corp.* and its kin." *Mtel*, 2016 WL 1171191, at *7.  The fact that the claims purport to exclude all use of RFID – an existing and conventional technology at the time the patents were filed – for their abstract purpose evidences that the patents are "improperly tying up the future use" of the "building blocks of human ingenuity." *Alice*, 134 S. Ct. at 2354.

Further, the patents are not directed to a particular technological problem specific to RFID systems or a problem "necessarily rooted in computer technology." *See DDR Holdings, LLC v. Hotels.com, LP*, 773 F.3d 1245, 1258 (Fed. Cir. 2014).  The problem the patents attempted to address was one of ***human*** error and inefficiency relating to inventory management (*see* Ex. B ('089 Patent) at Col. 1:24-49).  The patent claims simply utilize existing technology in the form of standard RFID and computer hardware to achieve the abstract end of locating, identifying and tracking objects in a more "accurate" and "effective" way (*id*.). The claims' use of this technology therefore does not render those claims patent-eligible.  *OIP Techs., Inc. v. Amazon.com, Inc*., 788 F.3d 1359, 1363 (Fed. Cir. 2015) ("Relying on a computer to perform routine tasks more quickly or more accurately is insufficient to render a claim patent eligible."); *Capital One*, 792 F.3d at 1367 ("Claiming the improved speed or efficiency inherent with applying the

abstract idea on a computer [does not] provide a sufficient inventive concept.");

*Concaten, Inc. v. Ameritrak Fleet Solutions, LLC*, No. 14-cv-00790-PAB-NYW,

2015 WL 5579562, at *7 (D. Colo. Sep. 23, 2015) (finding patents invalid because

they "relie[d] on existing technology" to implement the abstract idea, and did not

claim any improvement in the technology required to implement the idea).

## CONCLUSION

For the foregoing reasons, Coca-Cola respectfully requests that this Court

find that asserted claims of the patents-in-suit invalid for claiming unpatentable

subject matter pursuant to Section 101 of the Patent Act.

Respectfully submitted this 29th day of April, 2016.

By:   */s/  Shane Nichols*
A. Shane Nichols
Georgia Bar No. 524654
shane.nichols@alston.com
Siraj M. Abhyankar
Ga. Bar No. 484680
shri.abhyankar@alston.com
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA  30309-3424
Telephone:  404-881-7000
Fax:  404-881-7777

**Counsel for Defendant
THE COCA-COLA COMPANY**

## <u>CERTIFICATE OF SERVICE</u>

I certify that on April 29, 2016, I electronically filed THE COCA-COLA COMPANY'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE PLEADINGS with the Clerk of the Court using CM/ECF which will send electronic notification of such filing to all counsel of record.

<u>/s/ *Shane Nichols*</u>
A. Shane Nichols

## <u>CERTIFICATE OF COMPLIANCE WITH LR 5.1</u>

I certify that THE COCA-COLA COMPANY'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE PLEADINGS is written in 14 point Times New Roman font in accordance with Local Rule 5.1.

<u>/s/ *Shane Nichols*</u>
A. Shane Nichols