**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| AUTOMATED TRACKING SOLUTIONS, LLC, )<br><br>Plaintiff, )<br><br>v. )<br><br>THE COCA-COLA COMPANY, )<br><br>Defendant. ) | Civil Action No. 1:15-cv-04348-WD |

**PLAINTIFF AUTOMATED TRACKING SOLUTIONS, LLC'S**
**OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE**
**PLEADINGS**

## Table of Contents

I.  **Introduction**...................................................................... 1

II.  **Legal Standards** ............................................................... 3

    A.  Standard of Review for a Rule 12(c) Motion .......................3
    B.  Legal Analysis Under Section 101 of the Patent Act...........4

III.  **The Asserted Patents** ....................................................... 5

    A.  ATS's Patents-in-Suit Claim Novel Systems and Methods.................5
    B.  Defendant's Statement of Facts Mischaracterizes the ATS Patents.................................................................8

IV.  **Argument** ......................................................................... 9

    A.  *Alice* Step One: The Claims Do Not Recite an Abstract Idea...............9
        1.  Defendant Misapplies the "Directed To" Inquiry.................... 9
        2.  The Claims are Directed To Patent Eligible Subject Matter ................................................................. 14
    B.  *Alice* Step Two: The Other Elements of the Claims Present an Inventive Concept..........................................................20
    C.  The Claims Do Not Preempt the Identified Abstract Idea .................22
    D.  The "Machine or Transformation" Test Confirms Eligibility ...........24

V.  **Conclusion** ...................................................................... 25

# Table of Authorities

## <u>Cases</u>

*Alice Corp. v. CLS Bank International*, 134 S. Ct. 2347 (2014) ................... *passim*

*Avago Techs. Gen. IP (Sing) PTE Ltd. v. Asustek Computer, Inc.*,
   2016 U.S. Dist. LEXIS 55655 (N.D. Cal. Apr. 25, 2016) ..................................20

*Bilski v.Kappos*,
   561 U.S. 593 (2010) ........................................................... 5, 12, 15, 24

*Cronos Tech., LLC v. Expedia, Inc. et al.*,
   Case No. 13-1538 (D. Del. Sept. 8, 2015) .........................................................11

*DDR Holdings, LLC v. Hotels.com et al.*,
   773 F.3d 1245 (Fed. Cir. 2014) .......................................................23

*Diamond v. Diehr*,
   450 U.S. 175 (1981) ........................................................... 4, 5, 11

*Enfish, LLC v. Microsoft, Corp., et al.*,
   56 F. Supp. 3d 1167 (C.D. Cal. 2014) ................................................... 9

*Enfish, LLC v. Microsoft, Corp., et al.*
   No. 2015-1244, (Fed. Cir. May 12, 2016) ................................................... *passim*

*Hawthorne v. Mac Adjustment, Inc.*,
   140 F.3d 1367 (11th Cir. 1998) ................................................... 3, 4, 9

*Mayo Collaborative Services v. Prometheus Laboratories, Inc.*,
   132 S.Ct. 1289 (2012) ........................................................... 2, 4, 19

*Mobile Telecomms. Techs., LLC v. United Parcel Servs., Inc.*,
   *2016 U.S. LEXIS 39586 (*N.D. Ga. Mar. 24, 2016) ................................................... *passim*

*Powell v. Thomas*,
   643 F.3d 1300 (11th Cir. 2011) .......................................................3, 4

*Ronald A. Katz Tech. Licensing, L.P. v. FedEx Corp.*,
   2016 U.S. Dist. LEXIS 38479, (W.D. Tenn. Mar. 24, 2016) ..............................20

*SiRF Technology, Inc., et al. v. International Trade Commission, et al.*,
   601 F.3d 1319 (Fed. Cir. 2010) .................................................................. 24, 25

*Stoneeagle Servs. v. Pay-Plus Solutions, Inc.*,
   113 F. Supp. 3d 1241 (M.D. Fla. 2015)...........................................................23

*Summit 6, LLC v. HTC Corp. et. al.*,
   No. 14-00014, (N. D. Tex. May 28, 2015) ........................................................14

*Ultramercial, Inc. v. Hulu, LLC*,
   772 F.3d 709 (Fed. Cir. 2014)...........................................................................25

**Statutes**

35 U.S.C. § 101 ......................................................................................................1, 4

## I.     Introduction

Defendant misapplies the two-step test for determining patent eligibility set forth in the Supreme Court's *Alice v. CLS Bank* decision. In the first step, Defendant asks this Court to apply a "high level of generality," "sort of a 'quick look' test" (D.I. 70, [Def.'s Br.] at 14.) to find that the claims are directed to an abstract idea, citing a district court case, *Enfish v. Microsoft*, to support this approach. Last week, the Federal Circuit reversed that district court decision, holding that "describing the claims at such a high level of abstraction and untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule." *Enfish, LLC v. Microsoft, Corp., et al.* No. 2015-1244, slip op. at 14 (Fed. Cir. May 12, 2016).

Unlike Defendant, the Federal Circuit's *Enfish* decision follows the Supreme Court, which cautioned in *Alice* that when addressing the judicially created "exception" to patent eligibility for laws of nature, natural phenomena, and abstract ideas under 35 U.S.C. § 101, courts must "tread carefully" "lest it swallow all of patent law" because, "[a]t some level, all inventions … embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Alice Corp. v. CLS Bank International*, 134 S. Ct. 2347, 2354 (2014).

Defendant also misapplies *Alice* step two because even if the claims of the

patents-in-suit were found to be directed to an abstraction, this case falls squarely in the Supreme Court's admonition that an invention does not become patent ineligible simply because it involves an abstract concept. The claims of the patents-in-suit are directed to a technological improvement, inventive concepts that change the operation of a physical machine such that it operates in an unconventional way.

The flaw in Defendant's *Alice* analysis is best illustrated by Defendant's failure to address whether ATS's claims pose a danger of pre-empting the alleged abstract idea. The Supreme Court has explained that the concern that drives the Section 101 analysis is one of pre-emption—that claims directed only to an abstract idea will "tie up the future use of the building blocks of human ingenuity." *Alice*, 134 S.Ct. at 2354 (quoting *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 132 S.Ct. 1289, 1301 (2012)). Here, Defendant has not—and cannot—argue that ATS's patent claims tie up or preempt the abstract idea of "locating, identifying, and/or tracking physical objects." (D.I. 70 at 15). ATS's patents are directed to only one of a plethora of ways to perform Defendant's identified abstract idea, a fact that will become clear with a full factual record.

Dr. Fred Sawyer, the inventor of the asserted patents and co-founder of ATS, developed the claimed inventions after retiring as a Colonel in the U.S. Army. Dr. Sawyer drew on his years of military service, his years as a senior engineer at GE

Aerospace, and his educational background in Physics, Electrical Engineering, and Queuing Theory to solve a technological problem he identified in existing RFID systems. Dr. Sawyer then obtained a portfolio of nine U.S. patents on his inventions, with one pending. Notably, two of the four patents asserted here were granted by the USPTO *after* the Supreme Court's decisions in *Alice* and *Mayo*. But even though the USPTO—with the benefit of Supreme Court guidance—found no patent eligibility problem, Defendant asks this Court to find differently. Defendant seeks to meet its heavy burden to invalidate ATS's patents based on overturned case law supporting arguments that are contrary to Supreme Court, Federal Circuit, and USPTO precedent. This Court should deny Defendant's motion.

## II.    Legal Standards

### A.    Standard of Review for a Rule 12(c) Motion

In considering a motion for judgment on the pleadings, all facts alleged in the pleading must be accepted as true and construed in the light most favorable to the non-moving party. *Hawthorne v. Mac Adjustment, Inc.*, 140 F.3d 1367, 1370 (11th Cir. 1998); *Powell v. Thomas*, 643 F.3d 1300, 1302 (11th Cir. 2011). Judgment on the pleading is only appropriate "when there are no material facts in dispute, and judgment may be rendered by considering the substance of the pleadings and any judicially noticed facts." *Hawthorne*, 140 F.3d at 1370.

**B.     Legal Analysis Under Section 101 of the Patent Act**

Section 101 of the Patent Act states:  "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor…." 35 U.S.C. § 101. But "this provision contains an important implicit exception. '[L]aws of nature, natural phenomena, and abstract ideas'" are not patentable." *Mayo,* 132 S.Ct. 1289 (quoting *Diamond v. Diehr,* 450 U.S. 175 (1981)). The Supreme Court has "described the concern that drives this exclusionary principle as one of pre-emption." *Alice*, 134 S.Ct. 2354. But if a claim does not tie up the underlying idea, there is "no comparable risk of pre-emption, and therefore [the claim] remains eligible for the monopoly granted under our patent laws." *Id*. at 2354-55.

The Supreme Court established a two-part framework for determining whether claims are patent ineligible under 35 U.S.C. § 101. First, a Court must "determine whether the claims at issue are directed to one of those patent-ineligible concepts [laws of nature, natural phenomena, and abstract ideas]." *Alice*, 134 S.Ct. at 2355. Second, a Court must "consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Id*.

Further, the machine-or-transformation test remains a "useful and important

clue" for determining patent eligibility under § 101. *Bilski v. Kappos*, 561 U.S. 593, 604 (2010). A claim meets the machine-or-transformation test if "(1) it is tied to a particular machine or apparatus, or (2) it transforms a particular article into a different state or thing." *Id*. at 602.

## III.   The Asserted Patents

### A.   ATS's Patents-in-Suit Claim Novel Systems and Methods

The patents-in-suit relate to improved radio frequency identification (RFID) technology systems that can locate, identify, and track objects and people in near real time throughout facilities such as police departments, the Courts, and warehouses. ('089 patent[1], Abstract.) The systems in use at the time of the invention were insufficient and rife with problems. ('089 patent, 1:33-2:10.) For example, the specification discusses instances of evidence being misplaced that actually exists somewhere in the facility. ('089 patent, 1:40-44.) Traditional systems of the time such as hand-written logs, bar code systems, and traditional RFID systems simply were not equipped to solve this problem. ('089 patent, 1:33-37.) The claimed invention represented an improvement to such systems that could address these problems. ('089 patent, 2:11-30, 2:63-64.) Thus, the claimed

---

[1] All four asserted patents share a common specification. For ease of reference, citations herein will be to the '089 patent. The four patents are attached to the Complaint. (D.I. 1.)

invention achieves, for example, more effective inventory management through the use of RFID technology. ('089 patent, 2:45-57.)

FIG. 1 of the specification illustrates an exemplary facility covered by an inventory management system of the claimed invention.  ('089 patent, Fig. 1.) The inventory management system includes one or more RFID readers (scanners) and one or more antennas coupled to each reader (scanner). Each antenna has a field of view or coverage area. ('089 patent, 11:44-12:2.) An antenna's field of view (coverage area) is the area within which successful communications between the antenna and a transponder are possible. When a transponder—e.g., 104 (attached to an object) or 105 (attached to a person)—enters the antenna's coverage area, it can be detected by a reader coupled to the antenna.  ('089 patent, 11:60-62.)

As shown in FIG. 1, readers and their associated antennas may be deployed throughout the facility. ('089 patent, 11:44-12:27; FIG. 1.) In this manner, transponders can be detected, identified, located, and/or tracked throughout the facility. ('089 patent, 12:29-40.) A list of transponders detected by a reader is transmitted to a processor that performs appropriate processing, including generating detection information for the detected transponders as described in further detail below. ('089 patent, 12:55-57; 13:24-25.)

Detection information about each known transponder may be generated and

stored in an evidence location table or one or more system logs. ('089, 13:50-15:18; 16:36-17:26.) This information may include one or more data elements that represent the status of the known transponder in the system. For example, a known transponder may have a first data field (or flag) indicating whether the transponder is entering, exiting, or dwelling in a coverage area within the system and a second data field (or flag) indicating whether the transponder has been detected in the system at a prior time (i.e., previously detected). ('089 patent, 14:11-17, 33-39, and 57-63; 15:1-18.) In addition, the system may store a series of detection events for a transponder in a coverage area. (*See, e.g.*, '089 patent, 13:58-65; 14:11-16, 33-39; and 14:48-15:18.) A detection event may include a timestamp (date and time) and an indication of the antenna detecting the transponder (sensing antenna).

The system updates information for each "known" transponder ID currently detected. For example, if the detected "known" transponder ID was previously detected by the system, the processor may update the location of the transponder ID based on the location of the sensing antenna. ('089 patent, 13:58-61.) The system may further determine whether the "known" transponder ID entered, exited, or is dwelling in a coverage area based on, for example, the first detection (sighting) of a transponder in a coverage area, the continual detection of the transponder in the same coverage, or the last detection (sighting) of the transponder

in one coverage area and the first sighting of the same tag in another coverage area.

Through the novel and non-obvious compilation of this detailed ***detection***

***information***, the claimed system of the patents-in-suit can locate, identify, and

track a transponder within and throughout a facility having any number of antennas

and readers in near-real time, representing a significant technological improvement

on the systems currently in use at the time of the invention. Each of the asserted

claims is directed to aspects of the above description.

### B.  Defendant's Statement of Facts Mischaracterizes the ATS Patents

Though characterized as a "Statement of Facts," that section of Defendant's

brief contains mostly attorney argument about the novelty of the claimed

invention. Defendant characterizes the elements of the claims as "well-known,"

"standard," "generic," "ordinary," and "conventional" without reference to any

source in the pleadings, let alone the actual, complete language of the claims. (D.I.

70 at 3-7.) Further, none of these characterizations are made with reference to any

evidence of the state of the art or person of skill at the time of the invention.

Defendant isolates the "transponder," "reader," and "antenna" components

to support its attorney argument that these "were well-known structural

components used in existing RFID systems long before the date of invention

claimed here." (D.I. 70 at 6-7.) But in so doing, Defendant ignores that, taken as a

whole and as discussed below, the additional claim language informs the scope and meaning of each limitation in the claim. Further, Defendant goes beyond the pleadings to support its purported factual contentions. (*See, e.g.*, D.I. 70 at Ex. F., parties' proposed claim constructions.) Because Defendant's purported Statement of Facts contains material facts in dispute and go beyond the pleadings, judgment on the pleadings is not appropriate. *Hawthorne*, 140 F.3d at 1367.

## IV.   Argument

### A.   *Alice* Step One: The Claims Do Not Recite an Abstract Idea

#### 1.   Defendant Misapplies the "Directed To" Inquiry

In asking this Court to conduct a "high level," "quick look" at the claims to identify an abstract idea, Defendant relies on a district court decision, *Enfish v. Microsoft*. (D.I. 70 at 14-15 (citing *Enfish v. Microsoft*, 56 F. Supp.3d 1167 (C.D. Cal. 2014) (order granting motion for summary judgment) *reversed by Enfish v. Microsoft,* No. 15-1244 (Fed. Cir. May 12, 2016).) But last week the Federal Circuit reversed the *Enfish* district court that adopted this approach, holding that "the first step of the inquiry is a meaningful one" and that "describing the claims at such a high level of abstraction and untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule." *Enfish,* No. 2015-1244, slip op. at 14 (citing *Alice*, 134 S. Ct. at 2354 (noting that "we tread carefully in

construing this exclusionary principle [of laws of nature, natural phenomena, and abstract ideas] lest it swallow all of patent law")).

Properly applied, step one of the *Alice* inquiry requires the Court to "first determine whether the claims at issue are directed to a patent-ineligible concept." *Alice*, 134 S. Ct. at 2355. The Federal Circuit's *Enfish* decision last week made clear that "[t]he 'directed to' inquiry … cannot simply ask whether the claims *involve* a patent-ineligible concept, because essentially every routinely patent-eligible claim involving physical products and actions *involves* [an ineligible concept]—after all, they take place in the physical world." *Enfish,* No. 15-1244, slip op. at 10 (Fed. Cir. May 12, 2016)(emphasis in original). "Rather, the 'directed to' inquiry applies a stage-one filter to claims, considered in light of the specification, based on whether 'their *character as a whole* is directed to excluded subject matter.'" *Id.* (internal citations omitted)

Here, applying the now-rejected "quick look" approach, Defendant ignores the actual language of the claim and argues instead that they are all directed to the high-level abstraction of "locating, identifying, and tracking objects,"[2]—words that

_____

[2] Defendant has articulated the alleged abstract idea in several different ways, *inter alia*, "locating, identifying and tracking objects" (D.I. 70 at 1); "to locate, identify, and track physical objects for purposes of inventory control" (*Id.* at 15); "locating, identifying and tracking objects by receipt of object data through

at best appear only in the preamble of certain claims (*e.g.*, the '089 and '766 asserted patent claims) and at worst do not appear in the claims at all (*e.g.*, the '449 asserted patent claims). (D.I. 70 at 15).[3]

Defendant also relies heavily on this Court's analysis in *Mobile Telecomms. Techs., LLC v. United Parcel Servs., Inc.,* 2016 U.S. LEXIS 39586 (N.D. Ga. March 24, 2016) (cited hereafter as "*Mtel*"). Defendant highlights this Court's statement in that case that, when addressing whether a claim is directed to an abstract idea, "the trick is to try and detect the beating heart of the patent, its animating function." *Mtel,* at *7. But in keeping with its "quick look" approach, Defendant does not perform the same thorough analysis that this Court did in *Mtel*.

For example, the *Mtel* decision's *Alice* step one analysis carefully examined the actual language of the claims at issue, noting that "[m]ethod patents like the

---

standard RFID equipment, and then storing, processing, and comparing that data with generic 'storage devices' and 'processors' to locate, identify and track objects within the claimed system" (*Id*. at 16-17.) *Cronos Tech., LLC v. Expedia, Inc. et al.*, Case No. 13-1538, slip op at 5-6 (D. Del. Sept. 8, 2015)(denying  12(c) motion under section 101 where defendants proposed "at least four different versions of the abstract idea to which the challenged claims are purportedly directed.")

[3] In addition to the Federal Circuit's *Enfish* decision, the Supreme Court long ago cautioned that overgeneralizing claims, "if carried to its extreme, make[s] all inventions unpatentable because all inventions can be reduced to underlying principles of nature which, once known, make their implementation obvious." *Diamond*, 450 U.S. 175 at 189 n.12.

one at issue in this case present 'special problems in terms of vagueness and suspect validity.'" *Id.* at *7 (citing *Bilski*, 561 U.S. at 608.) Here, all but three of the 25 asserted claims are system claims, not method claims, and none can be performed entirely on a general purpose computer, though that fact alone still would not "doom[] the claims." *Enfish,* slip op. at 16 (Fed. Cir. May 12, 2016). And all of the instant claims including the method claims—on their face—require specialized physical hardware components as well as software, a fact that places these claims in better standing than those found eligible in *Enfish*. *Id.* at 17 (holding claims eligible because the fact "that the improvement is not defined by reference to 'physical' components does not doom the claims.") Where, as here, the claims *are* defined by reference to physical components, Defendant's reliance on *Mtel*—and the *Enfish* trial court decision—makes no sense.

Further, the *Mtel* decision compared the claims at issue there to the claims at issue in prior Supreme Court and Federal Circuit rulings that addressed whether claims were directed to an abstract idea. *Mtel* at *11. The *Mtel* decision determined that the claims at issue there—methods for notifying customers that their package is late, or has arrived—were the same kind of method claims found ineligible in *Alice* (method for intermediated settlement) and trial court cases involving methods for tracking. *Id.* at *5. But, perhaps because the asserted claims are so

- 12 -

different than those of *Alice*, *Bilski*, and a host of other Supreme Court and Federal Circuit decisions, Defendant here does not compare the specialized hardware and software claims at issue to claims those courts have previously struck down.

The remainder of Defendant's arguments all rely on this Court taking for granted that the claims are directed to the abstract idea that Defendant has chosen using its quick look, high-level generalization. Defendant cites *MacroPoint*, *Wireless Media*, and *Symantec* (D.I. 70 at 17-18), which it asserts were "directed to abstract concepts strikingly similar to those at issue here. (D.I. 70 at 17.) What is relevant, however, are the claims, and none of those cases involve *claims* that are similar to the ATS patents. *Enfish,* slip op. at 9 (Fed. Cir. May 12, 2016) (holding "both this court and the Supreme Court have found it sufficient to compare **claims** at issue to those **claims** already found to be directed to an abstract idea in previous cases")(emphasis added). Defendant performs no such comparison.

Defendant further states "[t]he Federal Circuit has repeatedly affirmed district court holdings that patents directed to methods that could be performed by humans are invalid." (D.I. 70 at 16).  This over-simplification by Defendant is only relevant if the Court accepts Defendant's ill-conceived abstract idea argument. Tellingly, Defendant never explains—with specific reference to the claim language—how a human could achieve the claimed system. And even if Defendant

did, "whether the claims of the Patents-in-Suit can be performed without computer" is a question of fact precluding judgment on the pleadings. *Summit 6, LLC v. HTC Corp. et. al.,* No. 14-00014, (N. D. Tex. May 28, 2015)(order denying motion for judgment on the papers).

Defendant employed a judicially-rejected application of *Alice* step one to conclude that the claims are directed to the abstract idea of "locating, identifying, and tracking objects." And this Court's *Mtel* decision, finding claims directed to an abstract idea, does not *ipso facto* warrant a similar ruling in this case as Defendant would have the Court believe. Defendant has failed to show the claims are directed to an abstract idea and its motion should be denied on that basis.

## 2. The Claims are Directed To Patent Eligible Subject Matter

Notably, the *Enfish* district court decision was not just vacated for improperly applying step one, it was reversed because a proper application of the step showed the claims were not directed to an abstract idea. In such an application, "the first step in the *Alice* inquiry … asks whether the focus of the claims is on the specific asserted improvement in computer capabilities." *Enfish,* slip op. at 11 (Fed. Cir. May 12, 2016). Here, the claims are not at all directed to using a computer in its general capacity, as *Alice*, *Bilski*, and so many others were. Instead, properly applying the directed to inquiry, the focus of the claims is on a

specific improvement to the way an RFID system operates. Specifically, claim 49,

representative of the '089 patent claims, recites:

> **49**. A system for locating, identifying, and/or tracking of at
> least one object, said system comprising:
>   a transponder affixable to the object, the transponder asso-
>     ciated with a transponder identification (ID);
>   a reader for detecting a transponder ID;
>   an antenna for communicating radio frequency (RF) sig-
>     nals between said reader and said transponder, the RF
>     signals including the transponder ID;
>   a storage device for storing known transponder IDs and
>     detection information associated with the stored known
>     transponder IDs, wherein the detection information
>     indicates whether the stored known transponder ID has
>     been previously detected by the system; and
>   a processor for comparing the known transponder IDs
>     stored in said storage device with the detected transpon-
>     der ID, and determining whether the detected transpon-
>     der ID is a detected known transponder ID based on the
>     comparison of the known transponder IDs with the
>     detected transponder ID.

Describing the invention based on the specification and tethered to the

claims, as the Federal Circuit prescribes, the claims are directed to a system having

RFID detection information associated with stored known RFID transponder IDs

that can be used to determine whether the stored known transponder ID has been

previously detected by the system, i.e., determining the state of the detected

transponder ID. This was an improvement on previous RFID systems that was not

well-known, routine, or conventional at the time of the inventions as Defendant

suggests. Rather, the specialized structures are integral to all of the claims of the

'089 patent, which are specifically designed to improve upon and address the

problems of systems for management of objects and people at the time by allowing

near-real time ability to locate, identify, and track RFID transponders within and

throughout a facility. ('089 patent, 1:33-2:10; 2:54-64.)

Similarly for the '766 patent, claim 1 is representative and recites:

> **1.** A system for locating, identifying and/or tracking of an object, the system comprising:
>    a first transponder associated with the object;
>    a reader that is configured to receive first transponder data via a radio frequency (RF) signal from the first transponder;
>    an antenna in communication with the reader and having a first coverage area;
>
> a processor coupled to the reader, wherein the processor is configured to receive the first transponder data from the reader**[and]**, to generate detection information based on the received first transponder data, the detection information comprising first sighting and last sighting of the first transponder in the first coverage area, *and to use the last sighting of the first transponder to determine whether the first transponder is dwelling in the first coverage area*; and
>    a storage device that is configured to store the detection information.

Examining the claims and specification of the '766 patent, the claims are

directed to a system having an antenna coverage area where detected transponder

data is used to generate ***detection information*** comprising the first sighting and the

last sighting of a transponder in the coverage area, which is used to determine

whether a transponder is dwelling in a coverage area. This was an improvement on

previous RFID systems that was not well-known, routine, or conventional at the

time of the invention, as Defendant suggests. Notably, when the '089 and '766

patents were submitted to the USPTO for *ex parte* reexamination amidst prior litigation in July 2011, the focus of the USPTO's novelty inquiry was not on the "locating, identifying, and tracking" language of the claim preamble, which Defendant calls the "beating heart," it was on the physical component elements in the body of the claims and their interaction as a combination of elements.

For the '013 patent, claim 1 is representative and recites:

> **1.** A system for locating, identifying and/or tracking a transponder having a transponder ID, the system comprising:
> a storage device configured to store a known transponder ID and detection information associated with the stored known transponder ID, wherein the detection information indicates whether the stored known transponder ID has been previously detected by the system and whether the stored known transponder ID has not been previously detected by the system; and
> a processor configured to compare the known transponder ID stored in said storage device with a detected transponder ID, and determine based on the comparison whether the detected transponder ID is a detected known transponder ID and whether the detected transponder ID is not a detected known transponder ID.

Examining the claims and specification of the '013 patent, the claims are directed to a system having a transponder with a known transponder ID and a storage device that stores known transponder IDs and associated ***detection information***. The detection information allows the system to determine whether the stored known transponder ID has been detected before. Again, this is an improvement that was not well-known, routine, or conventional.

For the '449 patent, claim 1 is representative and recites:

> **1.** An RFID system comprising:
> a processor configured to receive transponder data from a transponder associated with an object and generate detection information based on the received transponder data, the detection information comprising first sighting and last sighting of the transponder in a coverage area.

Examining the claims and specification of the '449 patent, the claims are directed to an RFID system that receives transponder data from transponders on objects and generates ***detection information*** like first sighting of the transponder and last sighting of the transponder in ***the coverage area***. This is not well-known, routine, or conventional as Defendant suggests. And, notably, both the '013 and the '449 patents issued from the USPTO *after* the Supreme Court's *Alice* decision, and the USPTO still determined the claims to be patent eligible. Indeed, by the time these patents issued in September and November 2014, respectively, USPTO examiners had already received significant guidance from the USPTO for examining eligibility issues in view of the Supreme Court's *Mayo* and *Alice* decisions.[4] Though not dispositive, the fact that the USPTO has already examined these two patents under the *Alice* framework—combined with the fact that

---

[4] On March 4, 2014, the USPTO issued its Procedure for Subject Matter Eligibility Analysis of Claims Reciting or Involving Laws of Nature/Natural Principles, Natural Phenomena, and/or Natural Products issued in view of *Mayo* and *Myriad*. Then, on June 25, 2014, the USPTO issued its Preliminary Examination Instructions in view of *Alice Corp*. (http://www.uspto.gov/patent/laws-and-regulations/examination-policy/2014-interim-guidance-subject-matter-eligibility-0)

Defendant uses a judicially-rejected application of that framework—compels denial of Defendant's motion.

Accordingly, for all four asserted patents, characterizing the invention with reference to the claims shows that they are directed to a system that can ascertain the state of a transponder in each antenna coverage area of a reader and can locate, identify and track a transponder within and throughout a facility having antennas and readers in near-real time, representing a significant technological improvement on the systems currently in use at the time of the invention.

And while this Court in *Mtel* found persuasive a number of recent district court cases striking down patents under section 101, the reason those cases were persuasive was because they involved patents that were "strikingly similar to [the *Mtel* patent]." *Mtel* at *10. ATS's patents-in-suit are very different than those at issue in *Mtel*, and a number of recent district court decisions, when confronted with similar claims, have refused to strike down patents under section 101.[5]

---

[5] *See, e.g.*, *Ronald A. Katz Tech. Licensing, L.P. v. FedEx Corp.*, 2016 U.S. Dist. LEXIS 38479, *14-19 (W.D. Tenn. Mar. 24, 2016) (denying 12(c) motion where claims directed to control system for communications facility not directed to abstract idea and structure elements of claims not all conventional); *Avago Techs. Gen. IP (Sing) PTE Ltd. v. Asustek Computer, Inc.*, 2016 U.S. Dist. LEXIS 55655, *18-19 (N.D. Cal. Apr. 25, 2016) (claims directed to decompressing video using a single memory "not simply claiming an abstract idea in the attempt to lay claim to

**B.**   ***Alice* Step Two: The Other Elements of the Claims Present an Inventive Concept**

Even if the claims were directed to the abstract idea Defendant has identified, for reasons discussed above, the elements of each claim, either individually or "as an ordered combination," include an "inventive concept" such that "the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Alice*, 134 S. Ct. at 2355.

The analysis for the inventive concept again requires engaging with the actual language of the claims—something Defendant refuses to do. As described above, the claims are all directed to solving specific technological problems with pre-existing systems for managing objects and people:  how do you identify, track, and locate objects in a facility in near-real time such that objects do not become lost even though they exist in the facility? Dr. Sawyer identified this as a "significant" problem in systems in use at the time of the invention. As explained above in IV.A.2., the claimed system of the patents-in-suit can ascertain detection information of a transponder in a coverage area of a reader based on the transponder ID and can locate, identify, and track a transponder within and

a building block of future research and development; the invention has specific configuration, not a broad abstract idea.")

- 20 -

throughout a facility having any number of antennas and readers in near-real time, representing a significant technological improvement on the systems of the time.

Defendant's liberal use of words like "generic," "well-known," and "standard" throughout its brief do nothing to liken the instant claims to those of *Alice* or any other case Defendant cites. *Alice* stands for the proposition that an abstract idea implemented on a generic computer does not amount to "something more." *Alice* said the "mere recitation of a generic computer cannot transform a patent-eligible abstract idea into a patent-eligible invention." *Alice*, 134 S.Ct. at 2358. The Court went on to say "[g]iven the ubiquity of computers, wholly generic computer implementation is not generally the sort of 'additional feature[e]' that provides any 'practical assurance that the process is more than a drafting effort designed to monopolize the [abstract idea] itself.'" *Id.* (citations omitted).

Here, Defendant asserts, without support, that the claimed system could be implemented with "generic" RFID and computer components. In addition to again raising a question of fact precluding judgment on the pleadings, Defendant fails to explain how, without using Dr. Sawyer's disclosure as a blueprint, the person of ordinary skill at the time of the invention could have implemented the claimed system. Instead, Defendant merely recounts the hardware components of the claims in isolation and concludes that those components were well known so the

elements do not add something more. Put another way, the full claim language and specification show that "generic" RFID components won't do:  instead, the claimed system improves upon RFID systems of the day to solve a specific problem. Defendant's overzealous interpretation of "generic computer" would swallow all software claims, and claims directed to electronic components, as well.

### C.      The Claims Do Not Preempt the Identified Abstract Idea

The Supreme Court explained that "in applying the §101 exception, we must distinguish between patents that claim the 'buildin[g] block[s]' of human ingenuity and those that integrate the building blocks into something more." *Alice*, 134 S. Ct. at 2354. Defendant's failure to address how the claims preempt all ways of "locating, identifying, and tracking objects" is a glaring omission given the importance the Court placed on this concern. *Id.* ("the concern that drives this exclusionary principle as one of pre-emption.")

The Federal Circuit, too, has emphasized the importance of pre-emption to the *Alice* analysis. In *DDR Holdings, LLC*, the Federal Circuit affirmed the district court's denial of defendant's motion for judgment as a matter of law that the patents failed to claim patentable subject matter. *DDR Holdings, LLC v. Hotels.com et al.*, 773 F.3d 1245, 1259 (Fed. Cir. 2014). The Court concluded that "[i]t is also clear that the claims at issue do not attempt to preempt every

application of the [abstract idea]." *Id.*; *Stoneeagle Servs. v. Pay-Plus Solutions, Inc.*, 113 F. Supp.3d 1241, 1252 (M.D. Fla. 2015) (denying motion for summary judgment under section 101, finding "that the asserted claims do not attempt to preempt [defendant's identified abstract idea], and do not seek to grant Plaintiff a monopoly over the relevant practice in the … industry.")

Here, Defendant—again without engaging with the claim language as a whole—summarily concludes that "ATS seeks to preempt all use of RFID to perform the abstract concepts of locating, identifying, and tracking objects." (D.I. 70 at 23.) At the outset, whether the claims would preempt "all use of RFID to perform locating, identifying, and tracking of objects" is a disputed material question of fact precluding judgment on the pleadings. In any event, rejecting Defendant's high-level abstraction and evaluating the claims on their face demonstrates that there are any number of solutions for the locating, identifying, and tracking of objects—using human-performed techniques, bar code technology, RFID technology, or a host of other solutions—that would not infringe the claims of the patents and suit. As described above, the RFID components of the claimed system operate in a specific way to address a specific technical problem. That is, the claims disclose a specialized RFID system having specialized RFID components to ascertain the state of the transponder in a coverage area for locating,

- 23 -

identifying, and tracking objects throughout a facility in near real time such that, for example, objects do not become lost even though they actually exist in the facility. ('089 patent, 1:33-2:10; 2:26-64.) But nothing in the claims preempts or ties up the identified abstract idea.

### D. The "Machine or Transformation" Test Confirms Eligibility

The pre-*Alice* machine-or-transformation test provides yet further confirmation that the claims are directed to patent-eligible subject matter. Though the machine or transformation test pre-dates Alice, "[c]ourts still consider [it] as part of Alice Corp.'s second step." *Mtel*, fn. 2. The patents-in-suit meet the machine or transformation test because they are "tied to a particular machine or apparatus." *Bilski*, 561 U.S. at 602. A "machine" is "a concrete thing, consisting of parts, or of certain devices and combination of devices." *SiRF Technology, Inc., et al. v. International Trade Commission, et al.*, 601 F.3d at 1332.

In *SiRF*, the GPS receiver was a machine that was held to be "integral" to the claims. *Id*. There the GPS receiver was recited throughout the claims, and the methods could not be performed without it. *Id*. The Court in *SiRF* held that the GPS receiver "place[d] a meaningful limit on the scope of the claims," which required the machine to "play a significant part in permitting the claimed method to be performed, rather than function solely as an obvious mechanism for

permitting a solution to be achieved more quickly." *Id*. at 1332-33.

Similar to the GPS receiver in *SiRF*, the claims of the patents-in-suit require a particular machine (an RFID system) with particular components (e.g., a transponder, a reader, an antenna, a storage device, a processor) to be configured in a particular way (e.g., to generate detection information, known transponder IDs, first sighting, last sighting, dwelling, etc.). The preamble of the claims recite a "system" or "RFID system." (*See, e.g.*, '089 patent, claims 49, 57, 62; '766 patent, claim 1; '013 patent, claims 1, 11, 15, 17; '449 patent, claim 1.) The claims, including the method claims, are tied to technology, referring specifically to a transponder, reader, and antenna. It would be impossible to implement the claims without these components. There would be nothing to transmit a signal from the object being managed to the system to determine its identity or location. Without these RFID components, not just a "general purpose computer," the asserted claims could not be implemented, so the RFID system and its components meaningfully limit the claims.  *See Ultramercial, Inc. v. Hulu, LLC,* 772 F.3d at 716.

## V.    Conclusion

For the foregoing reasons, Defendant's motion should be denied.

Respectfully submitted,

Dated:  May 20, 2016

/s/ Steven R. Daniels
Steven R. Daniels
Georgia State Bar No. 204865
sdaniels@farneydaniels.com
FARNEY DANIELS PC
800 S. Austin Ave., Suite 200
Georgetown, Texas 78626
Telephone:  (512) 582-2828
Facsimile:   (512) 582-2829

**ATTORNEYS FOR PLAINTIFF
AUTOMATED TRACKING
SOLUTIONS, LLC**

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing Plaintiff's Response in Opposition to the

Defendant's Motion for Judgment on the Pleadings complies with the font and

point selections approved by the Court in Local Rule 5.1C. The foregoing Brief

was prepared on a computer using the Times New Roman font (14 point).

/s/ Steven R. Daniels
Steven R. Daniels

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 20, 2016, I electronically filed the foregoing filing with the Clerk of Court using the CM/ECF system which will send notification of such filing *via* electronic mail to all counsel of records.

/s/ Steven R. Daniels
Steven R. Daniels