IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

AUTOMATED TRACKING
SOLUTIONS, LLC,

         **Plaintiff,**

    **v.**

THE COCA-COLA COMPANY,

         **Defendant.**

**1:15-cv-04348-WSD**

## OPINION AND ORDER

This matter is before the Court on Defendant The Coca-Cola Company's

Motion for Judgment on the Pleadings [70] ("Motion").  Also before this Court is

Defendant's Motion for Oral Argument [71].

**I.    BACKGROUND**

    A.    <u>Facts</u>

Plaintiff Automated Tracking Solutions, LLC ("ATS") is a Delaware limited

liability company, founded and owned by Dr. Fred H. Sawyer.  (Am. Compl. [33]

¶¶ 2, 12-13).  Dr. Sawyer "is the sole named inventor" in the four patents asserted

in this patent infringement action ("the Patents-in-Suit"):

1.      United States Patent No. 7,551,089 ("the '089 Patent"), titled "Method and Apparatus for Tracking Objects and People," which duly and legally issued on June 23, 2009;

2.      United States Patent No. 7,834,766 ("the '766 Patent"), titled "Method and Apparatus for Tracking Objects and People," which duly and legally issued on November 16, 2010;

3.      United States Patent No. 842,013 ("the '013 Patent"), titled "Method and Apparatus for Tracking Objects and People," which duly and legally issued on September 23, 2014; and

4.      United States Patent No. 8,896,449 ("the '449 Patent"), titled "Method and Apparatus for Tracking Objects and People," which duly and legally issued on November 25, 2014.

(Id. at ¶¶ 16 & 18-21).  The Patents-in-Suit are directed to "processes and systems that permit identification, tracking, location, and/or surveillance of tagged objects anywhere in a facility or area."  (Id. at ¶ 14).  These processes and systems seek to "integrate new RFID [(Radio-Frequency Identification)] technology into the[] manual processes [of inventory control]."  (Id. at ¶¶ 11-12).  ATS is "the assignee and owner of the right, title and interest in and to" the Patents-in-Suit, "including

the right to assert all causes of action arising under said patents and the right to any remedies for infringement of them."  (Id. at ¶ 22).

ATS alleges that Defendant The Coca-Cola Company ("Coca-Cola") has an exclusive licensing relationship with "ValidFill LLC related to ValidFill LLC's RFID beverage dispensing technology" for use in "Coca-Cola Freestyle beverage service machines."  (Id. at ¶ 8).  Coca-Cola allegedly, in violation of 35 U.S.C. § 271(a), "directly infringe[s], both literally and under the doctrine of equivalents," the Patents-in-Suit by "using RFID to monitor and track cartridges installed within the Freestyle beverage dispenser[s]."  (Id. at ¶¶ 25, 29, 33 & 37).

B.    Procedural History

On March 9, 2015, ATS filed this patent infringement action against Coca-Cola in the Eastern District of Virginia.  (See Original Compl. [1]).  On June 22, 2015, ATS filed its Amended Complaint.[1]  In the Amended Complaint, ATS seeks relief against Coca-Cola, including:  (i) adjudication that Coca-Cola has infringed the Patents-in-Suit, (ii) damages for past and present infringement of the

---

[1]    ATS's complaint included three defendants:  ValidFill, LLC, Royal Caribbean Cruises LTD, and Cola-Cola.  ATS and Defendants ValidFill, LLC and Royal Caribbean Cruises LTD filed a joint motion to dismiss with prejudice under Fed. R. Civ. P. 41(a)(2).  (See [52]).  The claims and counterclaims between these parties were dismissed with prejudice before this case transferred to this district. (See Order [53]).  Only Coca-Cola remains in this pending action.

Patents-in-Suit, both literally and under the doctrine of equivalents, and (iii) a royalty for any continued infringement of the Patents-in-Suit.  (See Am. Compl. [33] ¶¶ a-c, at 9).  On July 6, 2015, Coca-Cola filed its Answer [38], asserting at least ten different affirmative defenses.

On October 9, 2015, Coca-Cola filed a Motion to Transfer Venue [55].  On December 15, 2015, the Honorable Henry E. Hudson, United States District Judge for the Eastern District of Virginia, granted Coca-Cola's Motion and transferred the case to the Northern District Of Georgia.  (See Mem. Op. [63] and Order [64]).

On April 29, 2016, Coca-Cola filed its Motion.  Coca-Cola contends that "the Patent Act prohibits issuance of a patent directed merely to the automation of a manual and abstract process . . . through the use of well-known, existing computerized technology."  (See [70.1] at 2).  Coca-Cola asserts that, because the Patents-in-Suit are "directed to nothing more than an abstract idea," (id. at 1), "implemented with generic components, using existing and conventional RFID technology," (id. at 2-3), the Patents-in-Suit are "invalid under 35 U.S.C. § 101," (id. at 1).  Coca-Cola asks the Court to find the claimed processes and systems as

patent-ineligible under Section 101 of the Patent Act and grant it judgment on the pleadings.[2]

On May 20, 2016, ATS filed its Opposition to Defendant's Motion for Judgment on the Pleadings [74] ("Opposition"), contending that Coca-Cola "misapplies" the test for determining patent eligibility set forth by the Supreme Court. (See Opp'n [74] at 1). ATS argues, among other things, that (i) the claims of the Patents-in-Suit do not recite an abstract idea, (ii) the other elements of the claims of the Patents-in-Suit present an inventive concept, (iii) the claims of the Patents-in-Suit do not preempt any purported abstract idea, and (iv) the "machine or transformation" test confirms patent-eligibility. (See generally, id.).

On June 17, 2016, Coca-Cola filed its Reply Brief in Support of Its Motion for Judgment on the Pleadings [77] ("Reply"). Coca-Cola argues that ATS's arguments "mischaracterize[] the scope of the claimed invention and the controlling precedent concerning patent eligibility." (See Reply [77] at 1).

The parties filed a series of notices of supplemental authority to inform the Court of recent Federal Circuit decisions interpreting Section 101. On August 5, 2016, Coca-Cola filed its notice of supplemental authority [78],

_____

[2]     On April 29, 2016, Coca-Cola also filed a Motion for Oral Argument [71]. The Court determines that oral argument is unnecessary so the motion is denied.

informing the Court of the Federal Circuit's decision in Electric Power Group,
LLC v. Alstom S.A., 830 F.3d 1350 (Fed. Cir. Aug. 1, 2016).  Coca-Cola explains
that the Federal Circuit "affirmed that claims directed to methods for 'detecting
events on an interconnected electric power grid in real time' were invalid for
claiming patent ineligible subject matter."  (See Def.'s Notice [78] at 1).  On
August 12, 2016, ATS filed its notice of supplemental authority [79].  In ATS's
notice, ATS first argues that Coca-Cola "mischaracterizes" the Electric Power
decision.  (See Pl.'s Notice [79] at 1).  ATS next contends that the Federal
Circuit's recent decision in Bascom Global Internet Services, Inc. v. AT&T
Mobility LLC, 827 F.3d 1341 (Fed. Cir. June 27, 2016), "is far more relevant to
this case."  (Id. at 2).

    C.    <u>Patents-In-Suit</u>

The Patents-in-Suit are all titled "Method and Apparatus for Tracking
Objects and People" and share a common specification.[3]  The claimed invention as
disclosed in the Patents-in-Suit "relates generally to object or asset locating,
tracking, and surveillance, and, more particularly to a method and apparatus for
locating, identifying, tracking, and surveillance of physical objects and evidence in

---

[3]    For ease of reference, the Court will refer to the specification of the
'089 Patent.

environments such as police departments, law offices, and the Courts."

('089 Patent [70.4] at 1:17-22).

As way of background, the specification of the Patents-in-Suit explains that "[t]he systems in use [at the time of the invention] for handling physical evidence range[d] from honor systems and hand-written entries in logs to the more sophisticated bar code systems."[4] (Id. at 1:33-35).  These prior art "systems for tracking objects" had "significant" problems and were "inadequate."  (Id. at 1:39-40 & 2:11).  Accordingly, the specification explains that there was a need "to reduce human responsibility in locating, tracking, and surveillance of physical evidence"; a need "for an automatic locating and tracking system for managing evidence"; and a need of "better ways of locating, tracking and retrieving evidence years later."  (Id. at 1:48-49, 1:63-64 & 2:9-10).

"The invention [claimed in the Patents-in-Suit] solves the problems and overcomes the drawbacks and deficiencies of prior art systems" by employing certain computerized technologies.  (Id. at 2:46-54).  For example, the invention may "employ[] radio frequency identification (RFID) technology, computer programming and database applications, networking technologies, and hardware

---

[4]     ATS asserts that "[i]nventory control was conventionally performed primarily by hand or not at all."  (Am. Compl. [33] ¶ 11).

elements for locating, identifying, tracking, and surveillance of objects."  (Id. at 2:46-50).  "Alternatively, the present invention may employ laser and/or infrared technology, computer programming and database applications, networking technologies, and hardware elements for locating, identifying, tracking, and surveillance of objects."  (Id. at 2:50-54).  The invention may be "used to locate and track" objects "in near-real time," and "may be configured as part of a local area network, a wide area network, or the Internet."  (Id. at 2:58 & 61-62).

The specification explains that a "simple RFID system may be composed of three components:  a scanner, a transponder, and a computer."  (Id. at 3:10-12).  The system "may further include a plurality of transponders, scanners and antennas," "at least one application server for processing the data and being logically connectable to the scanner, at least one user terminal and workstation for inputting the data into the system, and at least one database server for managing and storing the data in an enterprise database."  (Id. at 4:16-22).

## II.   DISCUSSION

### A.   Legal Standard for Judgment on the Pleadings

"Judgment on the pleadings is appropriate where there are no material facts in dispute and the moving party is entitled to judgment as a matter of law." Cannon v. City of West Palm Beach, 250 F.3d 1299, 1301 (11th Cir. 2001).

8

Motions for judgment on the pleadings based on allegations of a failure to state a claim are evaluated using the same standard as a Rule 12(b)(6) motion to dismiss. See Sampson v. Washington Mut. Bank, 453 F. App'x 863, 865 n.2 (11th Cir. 2011); Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp., 305 F.3d 1293, 1295 n.8 (11th Cir. 2002); Provident Mut. Life Ins. Co. of Phila. v. City of Atlanta, 864 F. Supp. 1274, 1278 (N.D. Ga. 1994) ("A motion for judgment on the pleadings is subject to the same standard as is a Rule 12(b)(6) motion to dismiss.").

Dismissal of a complaint, pursuant to Rule 12(b)(6), is appropriate "when, on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." Marshall Cnty. Bd. of Educ. v. Marshall Cnty. Gas Dist., 992 F.2d 1171, 1174 (11th Cir. 1993). In considering a motion to dismiss, the Court accepts the plaintiff's allegations as true and considers the allegations in the complaint in the light most favorable to the plaintiff. See Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); Watts v. Fla. Int'l Univ., 495 F.3d 1289, 1295 (11th Cir. 2007); see also Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1273 n.1 (11th Cir. 1999). The Court is not required to accept a plaintiff's legal conclusions as true. See Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252, 1260 (11th Cir. 2009) (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)), abrogated on other grounds by Mohamad v. Palestinian Auth., — U.S. —, 132

9

S. Ct. 1702 (2012).  The Court also will not "accept as true a legal conclusion couched as a factual allegation."  See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  The complaint, ultimately, is required to contain "enough facts to state a claim to relief that is plausible on its face."  Twombly, 550 U.S. at 570.

To state a plausible claim for relief, the plaintiff must plead factual content that "allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678.  "Plausibility" requires more than a "sheer possibility that a defendant has acted unlawfully," and a complaint that alleges facts that are "merely consistent with" liability "stops short of the line between possibility and plausibility of 'entitlement to relief.'"  Id. (citing Twombly, 550 U.S. at 557); see also Arthur v. JP Morgan Chase Bank, NA, 569 F. App'x 669, 680 (11th Cir. 2014) (noting that Conley's "no set of facts" standard has been overruled by Twombly, and a complaint must contain "sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face."). "A complaint is insufficient if it 'tenders naked assertions devoid of further factual enhancement.'"  Tropic Ocean Airways, Inc. v. Floyd, 598 F. App'x 608, 609 (11th Cir. 2014) (quoting Iqbal, 556 U.S. at 678).

"To survive a motion to dismiss, plaintiffs must do more than merely state legal conclusions; they are required to allege some specific factual bases for those

10

conclusions or face dismissal of their claims." Jackson v. BellSouth Telecomms.,

372 F.3d 1250, 1263 (11th Cir. 2004); see also White v. Bank of America, NA,

597 F. App'x 1015, 1017 (11th Cir. 2014) ("[C]onclusory allegations, unwarranted

deductions of facts or legal conclusions masquerading as facts will not prevent

dismissal.") (quoting Oxford Asset Mgmt., Ltd. v. Jaharis, 297 F.3d 1182, 1188

(11th Cir. 2002)).[5]

### B.   Framework for Determining Patent-Eligible Subject Matter

Section 101 of the Patent Act defines patentable subject matter:

> Whoever invents or discovers any new and useful process, machine,
> manufacture, or composition of matter, or any new and useful
> improvement thereof, may obtain a patent therefor, subject to the
> conditions and requirements of this title.

35 U.S.C. § 101.  The Supreme Court has "long held that this provision contains an

important implicit exception:  Laws of nature, natural phenomena, and abstract

ideas are not patentable." Ass'n for Molecular Pathology v. Myriad Genetics, Inc.,

— U.S. —, 133 S. Ct. 2107, 2116 (2013) (quoting Mayo Collaborative Servs.

v. Prometheus Labs., Inc., — U.S. —, 132 S. Ct. 1289, 1293 (2012) (internal

---

[5]      Federal Rule of Civil Procedure 8(a)(2) requires the plaintiff to state "a short
and plain statement of the claim showing that the pleader is entitled to relief."
Fed. R. Civ. P. 8(a)(2).  In Twombly, the Supreme Court recognized the liberal
minimal standards imposed by Federal Rule 8(a)(2) but also acknowledged that
"[f]actual allegations must be enough to raise a right to relief above the speculative
level . . . ." Twombly, 550 U.S. at 555.

brackets omitted)).  "Patent eligibility under 35 U.S.C. § 101 is an issue of

law . . . ."  OIP Techs., Inc. v. Amazon.com, Inc., 788 F.3d 1359, 1362 (Fed. Cir.

2015).  The Section 101 inquiry provides "a basis for a patentability/validity

determination that is independent of—and on an equal footing with—any other

statutory patentability provision."[6]  Bascom, 827 F.3d at 1347 (citation omitted).

"Courts may therefore dispose of patent-infringement claims under § 101

whenever procedurally appropriate."  Id. at 1347 (citation omitted); see also OIP

Tech., 788 F.3d at 1364 (Mayer, J., concurring) (encouraging district courts to

resolve patent eligibility "at the first opportunity" because "[a]ddressing 35 U.S.C.

§ 101 at the outset" of litigation "conserves scarce judicial resources.").

        In Mayo, the Supreme Court faced the question whether specific processes

that helped doctors to determine the proper dosage level of a particular drug were

patentable.  Mayo at 132 S. Ct. at 1294.  The Supreme Court considered the

patents-in-question and determined that the patents set forth laws of nature or

natural relations.  Id. at 1296-97.  After concluding that the patents were directed to

---

[6]     The Supreme Court characterizes the § 101 patent-eligibility inquiry as "a
threshold test."  Bilski v. Kappos, 561 U.S. 593, 602 (2010).  Even if an invention
qualifies as patent eligible under § 101, "the claimed invention must also satisfy
'the conditions and requirements of this title,'" including "that the invention be
novel, see § 102, nonobvious, see § 103, and fully and particularly described, see
§ 112."  Id.

patent-ineligible subject matter, the Court next considered whether the patent claims were "sufficient to transform unpatentable natural correlations into patentable applications of those regularities."  Id. at 1298.  Mayo "set[s] forth a framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts."  Alice Corp. Pty. v. CLS Bank Int'l, — U.S. —, 134 S. Ct. 2347, 2355 (2014) (citing Mayo, 132 S. Ct. 1289 (2012)).  Alice extended Mayo's two-step analytical framework to abstract ideas.

Under the Mayo/Alice framework, the first step is to "determine whether the claims at issue are directed to one of those patent-ineligible concepts." DDR Holdings, LLC v. Hotels.com, L.P., 773 F.3d 1245, 1255 (Fed. Cir. 2014) (citing Alice, 134 S. Ct. at 2355).  The "directed to" inquiry "applies a stage-one filter to claims, considered in light of the specification, based on whether 'their character as a whole is directed to excluded subject matter.'"  Enfish, LLC v. Microsoft Corp., 822 F.3d 1327, 1335 (Fed. Cir. 2016) (citation omitted).

If the claims are directed to a patent-ineligible concept, the analysis proceeds to the second step of the Mayo/Alice framework.  During this second step, courts must "consider the elements of each claim—both individually and as an ordered combination—to determine whether the additional elements transform the nature

13

of the claim into a patent-eligible application of that abstract idea."  DDR

Holdings, 773 F.3d at 1255 (citing Alice, 134 S. Ct. at 2355).  "This second step is

the search for an 'inventive concept,' or some element or combination of elements

sufficient to ensure that the claim in practice amounts to 'significantly more' than a

patent on an ineligible concept."  Id.

Although the Supreme Court did not "delimit the precise contours of the

'abstract ideas' category" in Alice, the Supreme Court and the Federal Circuit have

provided some important guiding principles.  See Alice, 134 S. Ct. at 2357; DDR

Holdings, 773 F.3d at 1256.  First, mathematical algorithms or formulas, if

executed on a generic computer, are abstract ideas.  DDR Holdings, 773 F.3d at

1256; Enfish, 822 F. 3d at 1338.  Second, some fundamental economic and

conventional business practices, if performed on a generic computer, are also

abstract ideas.  DDR Holdings, 773 F.3d at 1256.  Third, longstanding, well-known

methods of organizing human behavior are also abstract ideas.  Bascom, 827 F.3d

at 1348.  Fourth, manipulating information—collecting information, analyzing

information, or presenting information—without more, is also an abstract idea.

Elec. Power Grp., 830 F.3d at 1354.

Since Alice, the Federal Circuit has identified two instances where the

challenged claims are not directed to patent-ineligible concepts under step one.

14

The Federal Circuit, in <u>Enfish</u>, found that "the plain focus of the claims is on an improvement to computer functionality itself, not on economic or other tasks for which a computer is used in its ordinary capacity."[7] <u>Enfish</u>, 822 F.3d at 1337. The Federal Circuit determined that the district court oversimplified the claims by concluding that "the claims were directed to the abstract idea of 'storing, organizing, and retrieving memory in a logical table' or, more simply, the concept of organizing information using tabular formats." <u>Id.</u> In rejecting the district court's conclusion, the Federal Circuit cautioned against oversimplifying the claims by "describing the claims at such a high level of abstraction and untethered from the language of the claims." <u>Id.</u>

In <u>McRo, Inc. v. Bandai Namco Games America Inc.</u>, the Federal Circuit, like in <u>Enfish</u>, found that the claims in that case were not directed to ineligible subject matter under step one. <u>McRo, Inc. v. Bandai Namco Games Am. Inc.</u>, 837 F.3d 1299 (Fed. Cir. Sept. 13, 2016). In <u>McRo</u>, the court also looked at the elements of the claim as "an ordered combination" and found that the claim

---

[7]     According to the Federal Circuit, the claimed invention had three key distinctions: (i) the claims were "not simply directed to *any* form of storing tabular data, but instead are specifically directed to a *self-referential* table for a computer database"; (ii) the specification taught that "the self-referential table functions differently than conventional database structures"; and (iii) the claimed invention achieved "benefits over conventional databases, such as increased flexibility, faster search times, and smaller memory requirements." <u>Id.</u>

"focused on a specific asserted improvement in computer animation, i.e., the automatic use of rules of a particular type."[8]  Id. at 1314.  The Federal Circuit determined that the incorporation of specific claimed rules improved the existing technological process.  Id.

In Enfish and McRo, the Federal Circuit found claim language reciting "specific improvements" that helped it determine in step one that the claims are not directed to abstract ideas.  "[S]ome inventions' basic thrust might more easily be understood as directed to an abstract idea," so the search for specific improvements in the recited computer technology could also take place under step two. DDR Holdings, 773 F.3d at 1348.  The Federal Circuit took this step-two analysis in DDR Holdings and Bascom.  In DDR Holdings, the Federal Circuit found that the claims "do not broadly and generically claim 'use of the Internet' to perform an abstract business practice (with insignificant added activity)."[9]  Id. at 1258.  The Federal Circuit observed that the claims do not merely perform on the Internet "some business practice known from the pre-Internet world."  Id. at 1257.  The

---

[8]    The Federal Circuit noted that the task previously performed by humans, "even if automated by rules, would not be within the scope of the claims."
[9]    The Federal Circuit found several distinctions:  (i) the claims specified "how interactions with the Internet are manipulated to yield [an unconventional] result"; (ii) the claimed invention caused the computer network to operate in a way that is not "its normal, expected manner"; and (iii) "the claims at issue do not attempt to preempt every application of the idea."  Id. at 1258-1259.

DDR Holdings court instead found that "the claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks."  Id.

In Bascom, the Federal Circuit found that "the limitations of the claims, taken individually, recite generic computer, network and Internet components, none of which is inventive by itself."  See Bascom, 827 F.3d at 1349.  The Federal Circuit found, however, that "an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces."[10]  Id. at 1350.  Even if filtering content is an abstract idea, the Court held that the claims recite a specific non-conventional implementation of the network technology.  The Court now applies this analytical framework and authorities to the Patents-in-Suit in this litigation.

C.    Analysis

1.    Representative Claims

In a § 101 analysis, courts may evaluate representative claims to determine whether the claims are "substantially similar and linked to the same abstract idea."

---

[10]    The Court determined that the specific method of filtering Internet content "by associating individual accounts with their own filter scheme" and "locating the filtering system on an ISP server" "cannot be said, as a matter of law, to have been conventional or generic."  Id.

See Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n, 776 F.3d 1343, 1348 (Fed. Cir. 2014).  Coca-Cola contends that "[e]very asserted claim recites generic RFID components and/or generic computer hardware."  ([70.2] at 5).  Coca-Cola identifies claim 49 of the '089 Patent as the representative claim for both '089 and '013 Patents, (id. at 6), and claim 1 of the '766 Patent as the representative claim for both '766 and '499 Patents, (id. at 9).  ATS identifies a representative claim for each of the Patents-in-Suit.  ATS argues that claim 49 of the '089 Patent, claim 1 of the '766 Patent, claim 1 of the '013 Patent, and claim 1 of the '449 Patent are all representative.[11]  (See [74] at 15-18).  Having reviewed the asserted claims, the Court finds that claim 49 of the '089 Patent is representative for both '089 and '013 Patents, and claim 1 of the '766 Patent is representative for both '766 and '499 Patents.

The asserted claims of the '089 and '013 Patents are substantially similar.  Representative claim 49 of the '089 Patent recites:

> A system for locating, identifying, and/or tracking of at least one object, said system comprising:
>
> > a transponder affixable to the object, the transponder associated with a transponder identification (ID);

---

[11]    Coca-Cola does not actively dispute that these claims are representative for each respective patent, (see [70.2] at 6, 8-9 & 11), but proposes to eliminate representative claim redundancy.

a reader for detecting a transponder ID;

an antenna for communicating radio frequency (RF) signals between said reader and said transponder, the RF signals including the transponder ID;

a storage device for storing known transponder IDs and detection information associated with the stored known transponder IDs, wherein the detection information indicates whether the stored known transponder ID has been previously detected by the system; and

a processor for comparing the known transponder IDs stored in said storage device with the detected transponder ID, and determining whether the detected transponder ID is a detected known transponder ID based on the comparison of the known transponder IDs with the detected transponder ID.

('089 Patent [70.4] at 30:15-33).  The first half of the claim recites RFID components:  a transponder, a reader, and an antenna; the second half of the claim recites a computer:  a storage device and a processor.  (See id. at Abstract ("[The system] may employ exemplary components such as RFID transponders or tags, scanners, antennas and computers to facilitate tacking of objects and people as needed.")).  Claim 1 of the '013 Patent is substantially similar.  ('013 Patent [70.5] at 20:59-21:6).  It is directed to a system for locating, identifying, and/or tracking a "transponder," and it comprises similar computer hardware performing the same "storing," "comparing," and "determining" functions.  (Id.).  Claim 1 of the '013 Patent, however, omits the "reader" and "antenna" elements.  (Id.).

19

The asserted claims of the '766 and '449 Patents are likewise substantially similar.  Representative claim 1 of the '766 Patent recites:

> A system for locating, identifying and/or tracking of an object, the system comprising:
>
> a first transponder associated with the object;
>
> a reader that is configured to receive first transponder data via a radio frequency (RF) signal from the first transponder;
>
> an antenna in communication with the reader and having a first coverage area;
>
> a processor coupled to the reader, wherein the processor is configured to receive the first transponder data from the reader, to generate detection information based on the received first transponder data, the detection information comprising first sighting and last sighting of the first transponder in the first coverage area, and to use the last sighting of the first transponder to determine whether the first transponder is dwelling in the first coverage area; and
>
> a storage device that is configured to store the detection information.

('766 Patent Reexam. Cert. [70.6] at 1:18-2:11).  Claim 1 of the '449 Patent is substantially similar, except that it is directed to an RFID system comprising a processor that performs similar function to "receive" data and "generate" detection information.  ('449 Patent [70.7] at 20:58-63).  For the purposes of its Section 101 analysis, the Court focuses on the two representative claims.

20

2.    <u>Step One</u>

The first step of the <u>Mayo</u>/<u>Alice</u> analysis asks whether the claims at issue are directed to one of those patent-ineligible concepts, such as an abstract idea. Coca-Cola contends that the claims are directed to the abstract idea of "locating, identifying, and/or tracking objects." ([70.2] at 14). According to Coca-Cola, this abstract idea of "locating, identifying, and/or tracking objects" is "without question a 'method of organizing human activity' that has long been prevalent in our system of commerce." (Id. at 15).

ATS argues that the Patents-in-Suit are not directed to any abstract ideas because, as ATS explains, "the claims *are* defined by reference to physical components." (Pl.'s Opp'n at 12). According to ATS, because all of the asserted claims "require specialized physical hardware components as well as software," the hardware elements necessarily make the claims "in better standing than those found eligible in *Enfish*." (<u>Id.</u>). ATS further questions "how a human could achieve the claimed system," asserting that this question of fact precludes judgment on the pleadings. (<u>Id.</u> at 14).

Courts are instructed to consider the claims "in light of the specification, based on whether 'their character as a whole is directed to excluded subject matter.'" <u>Enfish</u>, 822 F.3d at 1335. In determining whether the claims are directed

21

to an abstract idea, courts must be careful to avoid oversimplifying the claims because "[a]t some level, all inventions . . . embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas.'" Alice, 134 S. Ct. at 2354 (citing Mayo, 132 S. Ct. at 1293)).

On its face, representative claim 49 of the '089 Patent and representative claim 1 of the '766 Patent are directed to systems "for locating, identifying and/or tracking of" an object.[12] ('089 Patent at 30:15; '766 Patent Reexam. Cert. at 1:23). Both claims recite a set of RFID-related components, such as "a transponder," "a reader," and "an antenna," and a computer having software.  In representative claim 49 of the '089 Patent, the computer performs the functions of "storing known transponder IDs and detection information," "comparing the known transponder IDs with the detected transponder ID," and "determining whether the detected transponder ID is a detected known transponder ID."  In representative claim 1 of the '766 Patent, the computer is configured to "receive the first transponder data," "generate detection information," and "determine whether the first transponder" has "not mov[ed] for a period of time," and "store the detection information."

---

[12]     The Court has not construed the terms of the Patents-in-Suit.  For the purposes of this Order, the Court construes the terms in favor of the nonmovant ATS and uses ATS's proposed constructions.  (See [70.8]).

The specification describes the background of the invention as related to "locating and tracking" objects. ('089 Patent at 1:15-2:22).  Stated another way— as defined in ATS's own complaint—the invention is directed to "inventory control."  (Am. Compl. at ¶ 11).  The specification states that the prior art systems at that time had significant drawbacks[13] and that the claimed invention "reduces human responsibility" and provides "an automatic locating and tracking system" for inventory control.  (See '089 Patent at 1:48 & 63).

Viewing the claims in light of the specification, the Court finds that the representative claims are directed to abstract ideas.  The focus of the claims, as illustrated by the two representative claims above, is on collecting data, analyzing it, and determining the results based on the analysis of data.  The Court finds that the claims are similar to those asserted claims in Electric Power.  See generally Elec. Power Grp., 830 F.3d 1350.

ATS's argument that the claims require "specialized physical hardware components as well as software" does not change the abstract idea in the claims.  Not every claim reciting "concrete, tangible components escapes the reach of the abstract-idea inquiry."  In re TLI Commc'ns LLC Patent Litig., 823 F.3d 607, 611

---

[13]     The Amended Complaint also states that because of the prior art system, "business often faced significant shrinkage of inventory and increased labor costs as employees searched for missing items."  ([33] at ¶ 11).

(Fed. Cir. 2016) (claims reciting "a telephone unit" and a "server" are nonetheless directed to an abstract idea); see also Content Extraction, 776 F. 3d at 1347 (claims reciting a "scanner" are directed to an abstract idea); Mortg. Grader, Inc. v. First Choice Loan Serv. Inc., 811 F.3d 1314, 1324–25 (Fed. Cir. 2016) (claims reciting an "interface," "network," and a "database" are also directed to an abstract idea). While both representative claims require physical components—the RFID "transponder," "reader," and "antenna"—the specification makes clear that the recited physical components merely provide "an environment in which to carry out the abstract idea." See In re TLI, 823 F.3d at 611; see also '089 Patent at 2:45-54 ("The present invention . . . employ[s] radio frequency identification (RFID) technology" or alternatively, "laser and/or infrared technology."). These RFID components recited in the claims are tools used to collect data.[14] "[C]ollecting information, including when limited to particular content (which does not change its character as information)," is within the realm of abstract ideas. Elec. Power Grp., 830 F.3d at 1353.

The Court's conclusion is further supported by Enfish. In Enfish, the Federal Circuit considered "whether the focus of the claims is on the specific

---

[14] According to the specification, when the "transponder" is "detected by the system," "[d]ata may be transmitted to the main computer and the system's back-end processing may then initiate." ('089 Patent at 3:54-55).

asserted improvement in computer capabilities . . . or, instead, on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool." Enfish, 822 F.3d at 1335.  The Court does not find any specific purported improvement in computer capabilities in ATS's Amended Complaint or in the specification of the Patents-in-Suit.[15]  Contrary to ATS's argument that "the focus of the claims is on a specific improvement to the way an RFID system operates,"[16] ([74] at 14-15), the claims are not directed to a specific improvement to computer functionality, or even to RFID systems.  According to the specification, the problem facing the inventor was not, as ATS now asserts, related to RFID drawbacks and deficiencies.[17]  Instead, the inventor sought to "reduce human responsibility" by providing an "automatic" process of inventory management. (See '089 Patent at 1:34-35, 48 & 63; Am. Compl. ¶ 12).  RFID technology was

[15]     ATS's post hoc attempt to create support in the specification is disingenuous and not supportable.  ATS asserts that the specification of the '089 Patent supports the notion that "[t]raditional system of the time" included "hand-written logs, bar code systems, **and** traditional RFID systems."  ([74] at 5 (emphasis added)).  The language of the specification, however, shows that the "systems in use [at that time] . . . ranged from honor systems and hand-written entries in logs to the more sophisticated bar code systems."  ('089 Patent at 1:33-35).

[16]     ATS contends, without any support, that the invention was "an improvement on previous RFID systems that was not well-known, routine, or conventional." (See [74] at 15-18).

[17]     For example, the inventor was not faced with the problem of improving the RFID reader to increase its ability to detect a transponder, or improving the antenna to enhance communication of radio frequency.

merely "employed" as one possible option; other options such as employing laser or infrared technologies were also possible. (See '089 Patent at 2:45-47 & 50-51). The specification does not address how the RFID technology itself is improved: it does not describe a new or improved RFID transponder, a new or improved RFID reader, or a new or improved RFID antenna. Nor does the specification describe any "specific improvement to the way computers operate." Enfish, 822 F.3d at 1336. In Enfish, "the plain focus of the claims is on an improvement to computer functionality itself." Id. at 1336. Here, the focus of the claims is on certain abstract process for which computers are invoked merely as a means to achieve the ends. While the RFID technology employed by the invention was a rapidly developing technology at the time of the invention, the use of a conventional or generic computer in a nascent environment does not make the claims any less abstract.

### 3.   Step Two

Having found that the representative claims are directed to an abstract idea, the Court turns to step two of the Mayo/Alice inquiry to consider the elements of each claim. Step two is a search for an "inventive concept" or for "any additional elements that transform the nature of the claim into a patent-eligible application of that abstract idea." DDR Holdings, 773 F.3d at 1255 (citing Alice, 134 S. Ct. at

2355).  Here, the Court must look at the elements of each claim—both individually and as an ordered combination.  Id.

Looking at the elements individually, the Court finds that elements of the claims recite generic computer and RFID components.  As discussed above, the "processor" and "storage device" elements recite a generic computer, and the "transponder," "reader," and "antenna" elements recite generic RFID technology.  Taking these elements individually, the Court does not find any "inventive concept" significantly more than the abstract idea itself or any additional elements that transform the abstract idea into a patent-eligible invention.

The question then is whether an inventive concept can be found when viewing the elements as an ordered combination.  An inventive concept "can be found in the non-conventional and non-generic arrangement of known, conventional pieces."  Bascom, 827 F.3d at 1350.   The Court looks at the claims as an ordered combination and considers whether each representative claim contains a combination of elements sufficient to ensure that the claim amounts to "significantly more" than a patent on the abstract idea.  The Court finds they do not.

The representative claims are directed to a specific inventory management process.  This process begins with the RFID devices collecting certain data.  In

representative claim 49 of the '089 Patent, the system collects "transponder ID"; and in representative claim 1 of the '766 Patent, the system collects "transponder data." The data is then "transmitted to the main computer" to initiate "back-end processing." ('089 Patent at 3:54-55). On the backend, the main computer (that is, the "storage device" and "processor") has stored certain known information such as "known transponder IDs" and "detection information."

In representative claim 49 of the '089 Patent, the system next compares the data collected from the transponder with the known information. Through this comparison, the system determines if the detected data matches the known information. (See '089 Patent at 30:60-63 (claim 55)).

In representative claim 1 of the '766 Patent, the system first receives the data collected from the transponder. Based on the data received, the system generates specific detection information, which is stored in the computer, including the first detection of the transponder and the most recent detection of the transponder. Using the most recent detection of the transponder, the system then determines whether the transponder has "not mov[ed] for a period of time." (See [70.8]).

"The concept of data collection, recognition, and storage is undisputedly well-known. Indeed, humans have always performed these functions." Content Extraction, 776 F.3d at 1347; see also Elec. Power Grp., 830 F.3d at 1354 (treating

28

"analyzing information by steps people go through in their minds, or by mathematical algorithms, without more, as essentially mental processes within the abstract-idea category").  The steps of comparing data with known information, generating information related to first and most recent detection, and determining information based on the first and most recent detection, fall into the category of "manipulation of information," which "by itself does not transform the otherwise-abstract processes of information collection and analysis."  Elec. Power Grp., 830 F.3d at 1355.

The claims at issue here are different from the claims at issue in DDR Holding and in Bascom.[18]  The claims here do not require modification of the routine and conventional use of the RFID devices and computer.  They also do not use these generic components in a non-conventional combination or arrangement.  They merely disclose collecting data from a particular source, RFID transponders, and analyzing the data.  Viewed individually or as an ordered combination, the claims do not contain an inventive concept.

---

[18]    In DDR Holding, the Federal Circuit found an inventive concept in modifying the routine and conventional computer network in a manner that produced a hybrid web page.  In Bascom, the Federal Circuit found sufficient inventive concept in the non-conventional distribution of functionality within a network to perform the known concept of filtering content.

## III.    CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendant The Coca-Cola Company's Motion for Judgment on the Pleadings [70] is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant The Coca-Cola Company's Motion for Oral Argument [71] is **DENIED**.

**SO ORDERED** this 21st day of December, 2016.

_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE